**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| WESTFIELD INSURANCE COMPANY ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| -vs- ) | |
| ) | No. |
| MAXIM CONSTRUCTION CORPORATION, INC., , ) | |
| the CITY OF CRYSTAL LAKE, ILLINOIS, ) | |
| ENVIROGEN TECHNOLOGIES, INC., and the LAKE ) | |
| COUNTY PUBLIC WATER DISTRICT, ) | |
| ) | |
| *Defendants*. ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT

Now comes the Plaintiff, Westfield Insurance Company, ("Westfield"), by and through its attorneys, David S. Osborne, Christopher J. Pickett, and Justin K. Seigler of Lindsay, Rappaport & Postel, LLC, and for its Complaint for Declaratory Judgment against the Defendants, Maxim Construction Corporation, Inc. ("Maxim"), the City of Crystal Lake, Illinois ("the City"), Envirogen Technologies, Inc. ("Envirogen"), and the Lake County Public Water District, a local unit of an Illinois county government ("the District"), brought pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., alleges as follows:

### NATURE OF THE ACTION

1.     In this declaratory judgment action, Westfield seeks a declaration that it owes no duty to defend or indemnify its named insured, Maxim, with respect to separate actions filed by the City and Envirogen in connection with Maxim's construction and installation of an allegedly defective water treatment system.  Westfield also seeks a declaration that it does not owe a duty to defend or indemnify Maxim with respect to a third action filed by the District in connection with Maxim's construction and installation of an allegedly defective water clarifier.

**THE PARTIES**

2.      Westfield is an insurance company incorporated under the laws of the State of Ohio with its principal place of business located in Westfield Center, Ohio.

3.      On information and belief, Defendant Maxim Construction Corporation, Inc. is an Illinois corporation with its principal place of business in Volo, Illinois.

4.      The City is an Illinois municipality located in McHenry County, Illinois.

5.      Upon information and belief, Envirogen is a Delaware corporation with its principal place of business located in Kingwood, Texas.

6.      The District is a unit of local government in Lake County, Illinois, organized and existing pursuant to the Illinois Public Water District Act.

**JURISDICTION AND VENUE**

7.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiff and all Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.      Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to this litigation occurred in this judicial district and Maxim, the City and the District are all located in the Northern District of Illinois.

**THE UNDERLYING LAWSUITS**

**I.      The *City of Crystal Lake* Suit**

9.      On or about June 25, 2015, the City filed its Complaint for Breach of Contract against Maxim and Envirogen in the Circuit Court of the 22nd Judicial Circuit, McHenry County, Illinois, Cause No. 15 LA 199 ("the City Suit").  A true and correct copy of the City's Complaint for Breach of Contract ("the City Complaint") is attached hereto as Exhibit A and incorporated

herein by reference.

10.     The City Complaint asserts one claim against Maxim for breach of contract.

11.     Insofar as relevant herein, the City Complaint alleges as follows:

- The City owns and operates 11 water wells that supply drinking water to the City's residents and others.  Ex. A at ¶ 6.

- An order issued by the Illinois Environmental Protection Agency ("IEPA") requires the water pumped from one of those wells, namely Well 7, to be treated before it is introduced into the City's potable water supply system.  *Id*. at ¶ 7.

- In 2009 and 2010, the City prepared plans and specifications (collectively, "the Specifications") for the construction and installation of a treatment system, commonly known as an "ion exchange treatment system," that would treat Well 7's water as required by the IEPA ("the Treatment System") at the City's Water Treatment Plant #1 ("WTP #1").  *Id*. at ¶ 8.

- The project involved two primary components: (1) the construction necessary to prepare the building into which the Treatment System would be installed, and (2) the installation, testing, and startup of the Treatment System.  *Id*. at ¶ 9.

- In July 2010, the City issued the bidding documents, including the Specifications for the Treatment System at WTP #1, for the "Water Treatment Plant #1 Softener Replacement and Modification Project" ("the WTP #1 Project").  *Id*. at ¶ 12.

- Envirogen was the manufacturer of the ion exchange treatment system on which the Specifications were based.  *Id*. at ¶ 14.

- In August 2010, the City awarded a contract to Maxim to be the general contractor for the WTP #1 Project ("the Construction Contract").  *Id*. at ¶ 15.

- In September 2010, Maxim entered into a Purchase Order with Envirogen whereby Envirogen would build and deliver a treatment system ("the Envirogen System") to Maxim, and whereby Maxim would install the Envirogen System at WTP #1. *Id*. at ¶ 18.

- The Specifications were written such that the Envirogen System would be the Treatment System installed at WTP #1 under the Construction Contract. *Id*. at ¶ 21.

- In November 2010, Maxim commenced construction of the WTP #1 Project, including work on modifications to the existing WTP #1 building, before commencing installation of the Envirogen System in March 2011.  *Id*. at ¶¶ 29-30.

- During a May 2011 test, it was determined that Envirogen System did not meet all

3

of the performance standards in the Specifications. *Id.* at ¶¶ 31-32.

- By the end of August 2011, the Envirogen System failed and thus WTP #1 had to be shut down. *Id.* at ¶ 38.

- During the period between August 2011 and April 2012, the Envirogen System continued to fail Specifications requirements, while the City, Maxim, and Envirogen continued attempts to cause the Envirogen System to operate consistently with the Specifications. *Id.* at ¶¶ 41-42.

- During that time period, Maxim and Envirogen negotiated terms of an agreement to amend and supplement the Purchase Order, known as "Change Order No. 1." *Id.* at ¶ 43.

- After work was performed on the Envirogen System under Change Order No. 1, the Envirogen System failed the performance requirements of both Change Order No. 1 and the Specifications. *Id.* at ¶ 46.

- In May 2012, WTP #1 was restarted, but in October 2012 was shut down due to the failure of the System to operate within the performance Specifications, causing the WTP #1 pumps to be unable to sufficiently pump water through the Envirogen System. *Id.* at ¶¶ 47, 49.

- In May 2013, after extensive rehabilitation of the Envirogen System by the City, WTP #1 was restarted, but in September 2013 the City shut it down in order to avoid online failure and the need for another extensive rehabilitation of the System. *Id.* at ¶¶ 56-57.

- In September 2014, the City put WTP #1 into continuous operation due to high demands on the City's potable water system, but in October 2014 the City was forced to shut down WTP #1 because its pumps could not pump water through the failed Envirogen System. *Id.* at ¶¶ 59-60.

- The City has been unable to operate WTP #1 as provided in the Specifications, and thus unable to use Well 7 as it was designed and intended to be used, because of the failures of the Envirogen System. *Id.* at ¶ 62.

- Maxim did not fully comply with the terms of the Construction Contract. *Id.* at Count I, ¶ 73.

- The failure of the Envirogen System to perform as required by the Specifications constitutes a material breach of the Construction Contract. *Id.* at Count I, ¶ 75.

- As a result of Maxim's breach of contract, the City has sustained and will continue to sustain damages until the Envirogen System is removed and replaced with an ion exchange treatment system that complies with the Specifications. *Id.* at Count I, ¶

4

76.

- The City has incurred substantial costs as a result of the defective Envirogen System, including the following:

  o The City paid more than $1,200,000 for the defective Envirogen System and the building renovation to house it.

  o The City suffers recurring expenses because the defective Envirogen System must be taken offline during every seasonal water cycle.

  o The City suffers recurring expenses because it must disassemble, rehabilitate, reassemble, test, and restart the defective Envirogen System each season.

  o The City is required to assign two employees to maintain the defective Envirogen System, which should operate unattended.

  o The inability of the City to use Well 7 because WTP #1 is forced into shut-down by the defective Envirogen System asserts substantial strain on the other components of the City's potable water system.

  o The loss of Well 7 over substantial periods of time each season diminishes the overall capacity of the City's potable water system and puts the City at risk that it will not be able to meet the demands of the City's residents and other water customers.

  o The City is forced to operate its other potable water wells at greater capacities than good practices for system operation and conservation would allow.

  o The costs to remove and replace the defective Envirogen System or to implement an alternative method for treating the water pumped from Well 7 as required by the IEPA will be millions of dollars.

  o The City has suffered damages to its real property as a result of Maxim's breaches of contract, including but not limited to:

    ▪ the complete loss of the existing WTP #1 building as a result of the modifications made to the building necessary for and unique to the defective Envirogen System;

    ▪ the need to substantially reconstruct or demolish the modified WTP #1 building because it is unusable in its modified form;

    ▪ the shortened life expectancy of the other components of the City water supply and treatment systems as a result of excess use and strain imposed on those components when the defective Envirogen System is offline for

5

repairs or maintenance and WTP #1 is thus idled; and

  ▪ the depletion of its water resources from the City's other potable water wells as a result of the City's inability to use WTP #1 to its full and intended capacity.

*Id*. at Count I, ¶ 77.

12.    The City Complaint seeks an order directing Maxim to pay the City for all damages incurred as a result of Maxim's breach of contract, and all costs for the removal and replacement of the Envirogen System or other facilities and processes necessary to cause the water pumped from Well 7 to be treated as required by the IEPA.  Ex. A at Prayer for Relief.

## II.    The *Envirogen* Suit

13.    On or about March 25, 2014, Envirogen filed its Complaint against Maxim in the United States District Court for the Northern District of Illinois, cause no. 14-cv-02090 ("the Envirogen Suit").

14.    On or about August 17, 2015, Envirogen filed its Second Amended Complaint in the Envirogen Suit, naming the City as an additional defendant ("the Envirogen Complaint").  A true and correct copy of the Envirogen Complaint is attached hereto as Exhibit B and incorporated herein by reference.

15.    The Envirogen Complaint asserts a claim for breach of contract against Maxim.

16.    Insofar as relevant herein, the Envirogen Complaint alleges as follows:

  • In November 2009, the City, through the proceedings of the City Council, retained Trotter & Associates ("Trotter") to design and prepare bid documents for a renovation project known as "the Water Treatment Plant #1 Softener Replacement and Modification project" ("WTP #1 Project").  Ex. B at ¶ 12.

  • In July 2010, the City issued a request for proposals ("RFP") for the WTP #1 Project, which included an ion exchange water treatment system to be installed at Water Plaint #1, to general contractors.  *Id*. at ¶ 13.

  • On August 17, 2010, the City awarded the WTP #1 Project to Maxim.  *Id*. at ¶ 14.

- Soon thereafter, Maxim hired Envirogen as a subcontractor to supply the ion exchange water treatment system as set forth in section 11560 of the specification for the WTP #1 Project. *Id*. at ¶ 15.

- On August 29, 2010, Envirogen and Maxim signed a Purchase Order whereby Envirogen would supply its patented ion exchange water treatment system for Maxim to be installed at the Water Plant #1 at the City of The City. *Id*. at ¶ 16.

- The Purchase Order requires that the standard specification for the ion exchange water treatment system meet the requirements set forth under section 11560 of the specification in the WTP #1 Project. *Id*. at ¶ 17.

- The Purchase Order specifically states the parties' intent that Envirogen be an independent contractor, that there be no intended third-party beneficiaries, and that no entity other than Envirogen or Maxim be entitled to any claim, cause of action, remedy, or right of any kind under the Purchase Order. *Id*. at ¶ 18.

- Subject to the obligations for payment under the Purchase Order, Envirogen supplied to Maxim its patented ion exchange water treatment system meeting the requirements set forth under section 11560 of the specification in the WTP #1 Project. *Id*. at ¶ 19.

- Pursuant to the Purchase Order, Maxim promised to pay Envirogen a total sum of $948,565 for supplying the patented ion exchange water treatment system. *Id*. at ¶ 20.

- Beginning in or about January 2011, Maxim began making payments pursuant to the Purchase Order for the installation, sale, and continued use of Envirogen's patented ion exchange water treatment system. *Id*. at ¶ 21.

- Thereafter, on April 9, 2012, Maxim and Envirogen entered into a Change Order that amended and modified certain provisions of the Purchase Order. *Id*. at ¶ 22.

- The Change Order did not supersede the Purchase Order, and provisions of the Purchase Order not specifically modified, amended, altered, changed, or deleted by the Change Order remained the same. *Id*. at ¶ 23.

- The Change Order released Envirogen of all liabilities for delays or expenses resulting from any performance problems with the ion exchange water treatment system supplied by Envirogen with regard to the WTP #1 Project. *Id*. at ¶ 24.

- The Change Order did not modify, amend, alter, change or delete Paragraph 14.2 of Appendix B to the Purchase Order. *Id*. at ¶ 25.

- Pursuant to the Change Order, Maxim was to "rehabilitate" or "retrofit" the ion

7

exchange water treatment system supplied by Envirogen. *Id*. at ¶ 26.

- Following the retrofit, the ion exchange water treatment system was to be restarted and a performance test was to be conducted. *Id*. at ¶ 27.

- Maxim also agreed to pay Envirogen $8,370 to satisfy a claim for additional services provided at the request of the City and Trotter. *Id*. at ¶ 28.

- The Change Order also recognized and acknowledged a sum of unpaid invoices on the Purchase Order according to which Maxim owed Envirogen the sum of $180,227.35 and acknowledged a *per diem* interest rate accruing from July 1, 2012 forward at a rate of 12% per annum. *Id*. at ¶ 29.

- Envirogen has satisfied all of its obligations under the Purchase Order and the Change Order, while Maxim has failed to make payments under the Purchase Order as modified by the Change Order. *Id*. at ¶¶ 30-31.

- Maxim is in material breach of the Purchase Order as modified by the Change Order. *Id*. at ¶ 32.

- The City is not an intended beneficiary of the Purchase Order as modified by the Change Order, and has no claims, causes of action, remedies, or rights of any kind under the Purchase Order as modified by the Change Order. *Id*. at ¶¶ 33-34.

- Maxim has materially breached the Purchase Order by failing to pay the total sum of $948,565 for their use and sale of the patented ion exchange water treatment system, and has further breached the Order in other unknown ways. *Id*. at Count I, ¶¶ 39-40.

- Envirogen is therefore entitled to receive the balance owed, in addition to *per diem* interest, accruing at the rate of 12% per annum, or the maximum amount permitted by applicable law, whichever is lower, on all unpaid balances under the Purchase Order accruing from July 1, 2012 forward. *Id*. at Count I, ¶¶ 41-42.

- Envirogen has suffered monetary and other damages, in an as-yet-undetermined amount, as the direct and proximate result of Maxim's material breach of the Purchase Order. *Id*. at Count I, ¶ 43.

17.     Envirogen seeks an order holding (a) holding Maxim liable for breach of contract, (b) directing Maxim to provide an accounting and to pay Envirogen its actual damages for the breach of contract, (c) directing Maxim to pay the unpaid balance under the Purchase Order, (d) directing Maxim to pay interest on all unpaid balance, including attorneys' fees and costs, and (e)

directing Maxim to pay prejudgment and post-judgment interest. Ex. B at Prayer for Relief.

## III. The *Lake County Public Water District* Suit

18.     On or about April 6, 2015, the District filed its Complaint against Maxim and others in the Circuit Court of the 19th Judicial Circuit, Lake County, Illinois, cause no. 15 L 262 ("the District Suit"). A true and correct copy of the District's Complaint ("the District Complaint") is attached hereto as Exhibit C and incorporated herein by reference.

19.     The District Complaint asserts claims against Maxim for breach of contract (Count II) and breach of express and implied warranties of fitness for a particular purpose (Count IV).

20.     Insofar as relevant herein, the District Complaint alleges as follows:

- The District withdraws raw water from Lake Michigan, treats the water in compliance with the requirements of the Safe Drinking Water Act, and provides, at cost, the finished water supply requirements of various municipalities, in addition to the State of Illinois marina and park, pursuant to contracts. Part of the water treatment process involves use of solid contact units, commonly called clarifiers, to settle out and remove any solid particles in the water being treated. This complaint involves a new clarifier which the District caused to be constructed to meet increased customer demand for finished water. Ex. C at Count I, ¶ 2.

- On or about April 17, 2007, the District entered into a contract with Maxim ("the Maxim Contract") as general contractor for construction of a clarifier ("Clarifier #3") at the District's facility in Zion, Illinois, for a project known as "Water Treatment Plant Upgrade 6.5 MGD" ("the Project"). *Id*. at Count I, ¶¶ 7-8.

- Maxim engaged a supplier, Defendant WesTech Engineering, Inc., to supply certain components for the aforesaid facility. *Id*. at Count I, ¶ 10.

- The component provided by Maxim's supplier related to material and equipment for the portion of the contract pertaining to Clarifier #3. *Id*. at Count I, ¶ 12.

- Maxim elected to use the grade of stainless steel set forth in its supplier's shop drawings, specifically 304 L stainless steel, for the construction of Clarifier #3. *Id*. at Count I, ¶ 19.

- An important consideration to achieve optimum performance relative to the Project was to choose the correct grade of stainless steel for the chloride content in the water treatment, and to delineate the maintenance of that particular grade of stainless steel. *Id*. at Count I, ¶ 21.

9

- On or about October 14, 2011, Maxim completed its last work on the project. *Id.* at Count I, ¶ 23.

- Substantial corrosion and corrosive pitting occurred and continues to occur within the interior of Clarifier #3. If left unchecked, the corrosive pitting will eventually perforate the launder material in the clarifier and will compromise its structural integrity. *Id.* at Count I, ¶¶ 25, 27.

- The corrosion and pitting in Clarifier #3 could be alleviated and remediated by providing a barrier coating on the stainless steel. *Id.* at Count I, ¶ 31.

- The estimated cost to prepare the surface of the launders and detention hood and provide a barrier coating product for the stainless steel in Clarifier #3 ranges in excess of $74,300. Over the life of Clarifier #3, the barrier coating product would be expected to be replaced two or three times, at a total of approximately $220,000. *Id.* at Count II, ¶ 32.

- Under the Maxim Contract, Maxim had a duty to install and provide a stainless steel interior for Clarifier #3 using its best skill and attention, which Maxim failed to do, resulting in a corroded and corroding product. *Id.* at Count II, ¶¶ 33-34.

- Maxim further failed to provide the District with maintenance instructions, and failed to ensure that the stainless steel was suitable for service conditions, as required by the applicable specifications. *Id.* at Count II, ¶¶ 35-36.

- Maxim has breached the warranty provisions of the Maxim Contract by its supplier's refusal to financially assist the District in remediating the corrosion. *Id.* at Count II, ¶¶ 37-38, 42.

- As a result of Maxim's breach of contract, the District has sustained damage in that the District will be required to remediate the corrosion at its own expense. *Id.* at Count II, ¶ 43.

- Maxim has also breached the warranty of fitness for a particular purpose, in that it was aware of the purpose for which the District contracted for the stainless steel components for Clarifier #3, represented and warranted that said components were suitable for that purpose, and used stainless steel subject to corrosion and corrosive pitting, as set forth above. *Id.* at Count V, ¶ 38.

### THE WESTFIELD POLICIES

21.     Westfield issued policy no. TRA 5284060 to named insured Maxim Construction

Corp., effective September 15, 2010 until its cancellation on January 1, 2011, then renewed

through January 1, 2016 ("the Westfield policies"). True and correct copies of the Westfield policies are attached hereto, chronologically by policy period, as Exhibits D through I.

22.     The Westfield policies contain the following relevant CGL provisions:[1]

**SECTION I – COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.  Insuring Agreement**

    **a.**  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" of "property damage" to which this insurance does not apply. ***

    **b.**  This insurance applies to "bodily injury" and "property damage" only if:

        **(1)**  The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory;"

        **(2)**  The "bodily injury" or "property damage" occurs during the policy period; ***

*    *    *

**2.  Exclusions**

*    *    *

    **b.  Contractual Liability**

    "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reasons of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

        **(1)**  That the insured would have in the absence of the contract or agreement; or

        **(2)**  Assumed in a contract or agreement that is an "insured contract," provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for purposes of liability assumed in an "insured contract," reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage," provided:

            **(a)**  Liability to such party for, or for the cost of, that party's defense has also

---

[1] The policies in effect from September 2010 to January 2014 (*i.e.*, Exs. D, E, F, and G) contain coverage form no. CG 00 01 12 07. The policies in effect from January 2014 to January 2016 (*i.e.*, Exs. H and I) contain coverage form no. CG 00 01 04 13. The coverage forms are identical in all material respects.

been assumed in the same "insured contract;" and

**(b)** Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

*     *     *

**j.   Damage to Property**

"Property damage" to:

*     *     *

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

*     *     *

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

**k.   Damage to Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l.   Damage to Your Work[2]**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m.  Damage to Impaired Property or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work;" or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of

---

[2] Exs. D, E, F, G contain endorsement form no. CG 70 94 08 05, entitled "Contractors General Liability Expanded Plus Endorsement," which adds a third paragraph to this definition, as follows: "This exclusion only applies to that particular part of 'your work' out of which the damage arises."

sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product;"
**(2)** "Your work;" or
**(3)** "Impaired property;"

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

\* \* \*

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

\* \* \*

**2. Duties In The Event of Occurrence, Offense, Claim or Suit**

**a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

**(1)** How, when and where the "occurrence" or offense took place;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.[3]

**b.** If a claim is made or "suit" is brought against any insured, you must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable,

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.[4]

---

[3] Exs. D, E, F, and G contain endorsement form no. CG 70 94 08 05, entitled "Contractors General Liability Expanded Plus Endorsement," and Exs. H and I contains form no. CG 71 37 11 12, entitled "Commercial General Liability Contractors Endorsement," both of which provide as follows: "The requirement in Condition **2. a.** applies only when the 'occurrence' or offense is known to: \*\*\* **(3)** An 'executive officer' or insurance manager, if you are a corporation \*\*\*."

[4] Exs. D, E, F, G contain endorsement form no. CG 70 94 08 05, entitled "Contractors General Liability Expanded Plus Endorsement," and Exs. H and I contains form no. CG 71 37 11 12, entitled "Commercial

    **c.**  You and any other involved insured must:

        **(1)**  Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit;" ***

*       *       *

**SECTION V – DEFINITIONS**

*       *       *

**3.**  "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

*       *       *

**8.**  "Impaired property" means tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

    **a.**  It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

    **b.**  You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

**9.**  "Insured contract"[5] means:

*       *       *

    **f.**  That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf. *** Tort liability means a liability that would be imposed by law in the absence of any contract or agreement. ***

*       *       *

**13.**  "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

*       *       *

**16.**  "Products-completed operations hazard":

    **a.**  Includes all "bodily injury" and "property damage" occurring away from premises

---

General Liability Contractors Endorsement," both of which provide as follows: "The requirement in Condition **2. b.** will not be breached unless the breach occurs after such claim or 'suit' is known to: *** **(3)** An 'executive officer' or insurance manager, if you are a corporation ***."

[5] As modified by endorsement form nos. CG 24 26 07 04 (applicable to Exs. D, E, F, and G) and CG 24 26 04 13 (applicable to Exs. H and I), both entitled "Amendment of Insured Contract Definition."

you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

**(a)** When all of the work called for in your contract has been completed.

**(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

**(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

**(3)** Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it. ***

\*       \*       \*

**21.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;
**(b)** Others trading under your name; or

15

    **(c)** A person or organization whose business or assets you have acquired; and

    **(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

  **b.** Includes:

    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product;" and

    **(2)** The providing of or failure to provide warnings or instructions.

  **c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

  **a.** Means:

    **(1)** Work or operations performed by you or on your behalf; and

    **(2)** Materials, parts or equipment furnished in connection with such work or operations.

  **b.** Includes:

    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work;" and

    **(2)** The providing of or failure to provide warnings or instructions.

23. The Westfield policies in effect from January 2013 to January 2016 (*i.e.*, Exs. G, H, and I) contain a "Damage to 'Your Work'" endorsement, form no. AC-132 (1-90), which provides as follows:

**DAMAGE TO "YOUR WORK"**

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

WITH RESPECT TO COVERAGE PROVIDED BY THIS ENDORSEMENT, THE PROVISIONS OF THE COVERAGE FORM APPLY UNLESS MODIFIED BY THIS ENDORSEMENT.

  1. THE FOLLOWING IS ADDED TO SECTION I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY, PARAGRAPH 1. INSURING AGREEMENT:

    F.   DAMAGES BECAUSE OF "PROPERTY DAMAGE" INCLUDE DAMAGES THE INSURED BECOMES LEGALLY OBLIGATED TO PAY BECAUSE OF "PROPERTY DAMAGE" TO "YOUR WORK" AND SHALL BE DEEMED TO BE CAUSED BY AN "OCCURRENCE", BUT ONLY IF:

        (1)   THE "PROPERTY DAMAGE" IS ENTIRELY THE RESULT OF WORK PERFORMED ON YOUR BEHALF BY A SUBCONTRACTOR(S) THAT IS NOT A NAMED INSURED.

        (2)   THE WORK PERFORMED BY THE SUBCONTRACTOR(S) IS WITHIN THE "PRODUCTS-COMPLETED OPERATIONS HAZARD" AND;

        (3)   THE "PROPERTY DAMAGE" IS UNEXPECTED AND UNINTENDED FROM THE STANDPOINT OF THE INSURED.

24.    The Westfield policies also contain the following relevant commercial umbrella coverage provisions:[6]

**SECTION I – COVERAGES**

**COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.  Insuring Agreement**

    **a.**   We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking damages for such "bodily injury" or "property damage" when the "underlying insurance" does not provide coverage or the limits of "underlying insurance" have been exhausted. *** However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. ***

    **b.**   This insurance applies to "bodily injury" and "property damage" only if:[7]

        **(1)**  The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

        **(2)**  The "bodily injury" or "property damage" occurs during the policy period; ***

---

[6] The policies in effect from September 2010 to January 2014 (*i.e.*, Exs. D, E, F, and G) contain coverage form no. CU 00 01 12 07. The policies in effect from January 2014 to January 2016 (*i.e.*, Exs. H and I) contain coverage form no. CU 00 01 04 13. The coverage forms are identical in all material respects.
[7] Exs. D, E, F, and G designate this provision as subparagraph **b.**, as above, while Exs. H and I designate it as subparagraph **c.** The provisions are otherwise identical.

\*  \*  \*

**2. Exclusions**

The insurance provided by this coverage does not apply to:

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract," provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for purposes of liability assumed in an "insured contract," reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage," provided:

 **(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract;" and

 **(b)** Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

\*  \*  \*

**m. Damage to Property**

"Property damage" to:

\*  \*  \*

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

\*  \*  \*

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

\*  \*  \*

**n. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

18

**o. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a sub-contractor.

**p. Damage to Impaired Property or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work;" or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**q. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product;"
**(2)** "Your work;" or
**(3)** "Impaired property;"

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

\*     \*     \*

**SECTION IV –CONDITIONS**

\*     \*     \*

**3. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

**a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense, regardless of the amount, which may result in a claim. To the extent possible, notice should include:

**(1)** How, when and where the "occurrence" or offense took place;

**(2)** The names and addresses of any injured persons and witnesses; and

19

    **(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b.** If a claim is made or "suit" is brought against any insured, you must:

    **(1)** Immediately record the specifics of the claim or "suit" and the date received; and

    **(2)** Notify us as soon as practicable,

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

    **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit;" ***

*    *    *

## SECTION V – DEFINITIONS

*    *    *

**8.** "Impaired property" means tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

**9.** "Insured contract"[8] means:

*    *    *

**g.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf. *** Tort liability means a liability that would be imposed by law in the absence of any contract or agreement. ***

*    *    *

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

---

[8] As modified by endorsement form nos. CU 24 30 03 05 (applicable to Exs. D, E, F, and G) and CU 24 30 04 13 (applicable to Exs. H and I), both entitled "Amendment of Insured Contract Definition."

*     *     *

**17.** "Products-completed operations hazard":

    **a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

        **(1)** Products that are still in your physical possession; or

        **(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

            **(a)** When all of the work called for in your contract has been completed.

            **(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

            **(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

        Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

    **b.** Does not include "bodily injury" or "property damage" arising out of:

        **(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

        **(2)** The existence of tools, uninstalled equipment or abandoned or unused materials.

**18.** "Property damage" means:

    **a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    **b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it. **\*\*\***

*     *     *

**27.** "Your product":

    **a.** Means:

        **(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

            **(a)** You;

21

      **(b)** Others trading under your name; or

      **(c)** A person or organization whose business or assets you have acquired; and

    **(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

  **b.** Includes:

    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product;" and

    **(2)** The providing of or failure to provide warnings or instructions.

  **c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**28.** "Your work":

  **a.** Means:

    **(1)** Work or operations performed by you or on your behalf; and

    **(2)** Materials, parts or equipment furnished in connection with such work or operations.

  **b.** Includes:

    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work;" and

    **(2)** The providing of or failure to provide warnings or instructions.

25. There may be other pertinent CGL and commercial umbrella coverage provisions contained in the Westfield policies, and Westfield reserves the right to plead them in the future.

## COUNT I
### NO DUTY TO DEFEND OR INDEMNIFY MAXIM WITH RESPECT TO THE CITY SUIT

26. Westfield restates and incorporates the allegations of paragraphs 1 through 25, above, as if set forth fully herein.

27. Westfield does not owe a duty to defend or indemnify Maxim under the Westfield policies' CGL coverage with respect to the City Suit for one or more of the following reasons, pled hypothetically or in the alternative:

22

a. The City Complaint does not allege any "occurrence," as it alleges only the natural and ordinary consequences of defectively performed work, rather than an "accident."

b. The City Complaint does not allege "property damage," as it alleges only economic losses from the performance of defective construction work.

c. Maxim failed to provide timely notice to Westfield of the claims giving rise to the City Suit, as required by the Westfield policies' notice provisions, which are conditions precedent to coverage.

d. The Westfield policies' exclusion for "contractual liability," exclusion **b.**, negates any coverage that might otherwise exist.

e. The Westfield policies' exclusion for "damage to property," exclusion **j.**, negates any coverage that might otherwise exist.

f. The Westfield policies' exclusion for "damage to your product," exclusion **k.**, negates any coverage that might otherwise exist.

g. The Westfield policies' exclusion for "damage to your work," exclusion **l.**, negates any coverage that might otherwise exist.

h. The Westfield policies' exclusion for "damage to impaired property or property not physically injured," exclusion **m.**, negates any coverage that might otherwise exist.

i. The Westfield policies' exclusion for "recall of products, work or impaired property," exclusion **n.**, negates any coverage that might otherwise exist.

j. The coverage for "damage to your work" provided by endorsement form no. AC-132 (1-90), contained in the Westfield policies in effect from January 2013 to January 2016 (*i.e.*, Exs. G, H, and I), does not apply because none of the damages alleged qualify as "property damage," as defined by the policies, but rather constitute mere economic loss.

k. The coverage for "damage to your work" provided by endorsement form no. AC-132 (1-90), contained in the Westfield policies in effect from January 2013 to January 2016 (*i.e.*, Exs. G, H, and I), does not apply because any damages which, *arguendo*, qualify as "property damage" alleged by the City Complaint are not alleged to have been "entirely the result of work performed on [Maxim's] behalf by a subcontractor," as required under subparagraph F.(1).

l. The coverage for "damage to your work" provided by endorsement form no. AC-132 (1-90), contained in the Westfield policies in effect from January 2013 to January 2016 (*i.e.*, Exs. G, H, and I), does not apply because – as a matter of law – any "property damage" alleged by the City Complaint is not alleged to have been

23

"unexpected and unintended from the standpoint of [Maxim]," as required under subparagraph F.(3).

28. Westfield does not owe a duty to defend or indemnify Maxim under the Westfield policies' commercial umbrella coverage with respect to the City Suit for one or more of the following reasons, pleading hypothetically or in the alternative:

a. The City Complaint does not allege any "occurrence," as it alleges only the natural and ordinary consequences of defectively performed work, rather than an accident.

b. The City Complaint does not allege "property damage," as it alleges only economic losses in the form of the cost of repairing and replacing defective construction work.

c. Maxim failed to provide timely notice to Westfield of the claims giving rise to the City Suit, as required by the Westfield policies' notice provisions, which are conditions precedent to coverage.

d. The Westfield policies' exclusion for "contractual liability," exclusion **b.**, negates any coverage that might otherwise exist.

e. The Westfield policies' exclusion for "damage to property," exclusion **m.**, negates any coverage that might otherwise exist.

f. The Westfield policies' exclusion for "damage to your product," exclusion **n.**, negates any coverage that might otherwise exist.

g. The Westfield policies' exclusion for "damage to your work," exclusion **o.**, negates any coverage that might otherwise exist.

h. The Westfield policies' exclusion for "damage to impaired property or property not physically injured," exclusion **p.**, negates any coverage that might otherwise exist.

i. The Westfield policies' exclusion for "recall of products, work or impaired property," exclusion **q.**, negates any coverage that might otherwise exist.

29. There may be other bases on which Westfield can properly deny coverage, and Westfield reserves the right to plead them in the future.

WHEREFORE, the Plaintiff, WESTFIELD INSURANCE COMPANY, prays that this Honorable Court enter an Order finding and declaring that it does not owe a duty to defend or indemnify the Defendant, MAXIM CONSTRUCTION CORPORATION, INC., with respect to

the underlying lawsuit filed by the Defendant, the CITY OF CRYSTAL LAKE, ILLINOIS, in the Circuit Court of the 22nd Judicial Circuit, McHenry County, Illinois, Cause No. 15 LA 199, under the commercial general liability and commercial umbrella coverage of Westfield Policy No. TRA 5284060, and for such other and further relief as this Court deems fair and just under the circumstances.

## COUNT II
### NO DUTY TO DEFEND OR INDEMNIFY MAXIM WITH RESPECT TO THE ENVIROGEN SUIT

30. Westfield restates and incorporates the allegations of paragraphs 1 through 25, above, as if set forth fully herein.

31. Westfield does not owe a duty to defend or indemnify Maxim under the Westfield policies' CGL coverage with respect to the Envirogen Suit for one or more of the following reasons, pled hypothetically or in the alternative:

    a. The Envirogen Complaint does not allege any "occurrence," as it alleges only the natural and ordinary consequences of defectively performed work, rather than an "accident."

    b. The Envirogen Complaint does not allege "property damage," as it alleges only economic losses from the performance of defective construction work.

    c. Maxim failed to provide timely notice to Westfield of the Envirogen Suit, as required by the Westfield policies' notice provisions, which are conditions precedent to coverage.

    d. The Westfield policies' exclusion for "contractual liability," exclusion **b.**, negates any coverage that might otherwise exist.

    e. The Westfield policies' exclusion for "damage to property," exclusion **j.**, negates any coverage that might otherwise exist.

    f. The Westfield policies' exclusion for "damage to your product," exclusion **k.**, negates any coverage that might otherwise exist.

    g. The Westfield policies' exclusion for "damage to your work," exclusion **l.**, negates any coverage that might otherwise exist.

25

h. The Westfield policies' exclusion for "damage to impaired property or property not physically injured," exclusion **m.**, negates any coverage that might otherwise exist.

i. The Westfield policies' exclusion for "recall of products, work or impaired property," exclusion **n.**, negates any coverage that might otherwise exist.

j. The coverage for "damage to your work" provided by endorsement form no. AC-132 (1-90), contained in the Westfield policies in effect from January 2013 to January 2016 (*i.e.*, Exs. G, H, and I), does not apply because none of the damages alleged in the Envirogen complaint qualify as "property damage," as defined by the policies, but rather constitute mere economic loss.

k. The coverage for "damage to your work" provided by endorsement form no. AC-132 (1-90), contained in the Westfield policies in effect from January 2013 to January 2016 (*i.e.*, Exs. G, H, and I), does not apply because any damages which, *arguendo*, qualify as "property damage" alleged by the Envirogen Complaint are not alleged to have been "entirely the result of work performed on [Maxim's] behalf by a subcontractor," as required under subparagraph F.(1).

l. The coverage for "damage to your work" provided by endorsement form no. AC-132 (1-90), contained in the Westfield policies in effect from January 2013 to January 2016 (*i.e.*, Exs. G, H, and I), does not apply because – as a matter of law – any "property damage" alleged by the Envirogen Complaint is not alleged to have been "unexpected and unintended from the standpoint of [Maxim]," as required under subparagraph F.(3).

32. Westfield does not owe a duty to defend or indemnify Maxim under the Westfield policies' commercial umbrella coverage with respect to the Envirogen Suit for one or more of the following reasons, pleading hypothetically or in the alternative:

a. The Envirogen Complaint does not allege any "occurrence," as it alleges only the natural and ordinary consequences of defectively performed work, rather than an accident.

b. The Envirogen Complaint does not allege "property damage," as it alleges only economic losses in the form of the cost of repairing and replacing defective construction work.

c. Maxim failed to provide timely notice to Westfield of the Envirogen Suit, as required by the Westfield policies' notice provisions, which are conditions precedent to coverage.

d. The Westfield policies' exclusion for "contractual liability," exclusion **b.**, negates

any coverage that might otherwise exist.

e.   The Westfield policies' exclusion for "damage to property," exclusion **m.**, negates any coverage that might otherwise exist.

f.   The Westfield policies' exclusion for "damage to your product," exclusion **n.**, negates any coverage that might otherwise exist.

g.   The Westfield policies' exclusion for "damage to your work," exclusion **o.**, negates any coverage that might otherwise exist.

h.   The Westfield policies' exclusion for "damage to impaired property or property not physically injured," exclusion **p.**, negates any coverage that might otherwise exist.

i.   The Westfield policies' exclusion for "recall of products, work or impaired property," exclusion **q.**, negates any coverage that might otherwise exist.

33.   There may be other bases on which Westfield can properly deny coverage, and Westfield reserves the right to plead them in the future.

WHEREFORE, the Plaintiff, WESTFIELD INSURANCE COMPANY, prays that this Honorable Court enter an order finding and declaring that it does not owe a duty to defend or indemnify the Defendant, MAXIM CONSTRUCTION CORPORATION, INC., with respect to the underlying lawsuit filed by the Defendant, ENVIROGEN TECHNOLOGIES, INC., in the United States District Court for the Northern District of Illinois, cause no. 14-cv-02090, under the commercial general liability and commercial umbrella coverage of Westfield Policy No. TRA 5284060, and for such other and further relief as this Court deems fair and just under the circumstances.

## COUNT III
### NO DUTY TO DEFEND OR INDEMNIFY MAXIM
### WITH RESPECT TO THE DISTRICT SUIT

34.   Westfield restates and incorporates the allegations of paragraphs 1 through 25, above, as if set forth fully herein.

35.   Westfield does not owe a duty to defend or indemnify Maxim under the Westfield

policies' CGL coverage with respect to the District Suit for one or more of the following reasons, pled hypothetically or in the alternative:

a. The District Complaint does not allege any "occurrence," as it alleges only the natural and ordinary consequences of defectively performed work, rather than an "accident."

b. The District Complaint does not allege "property damage," as it alleges only economic losses in the form of the cost of repairing and replacing defective construction work.

c. Maxim failed to provide timely notice to Westfield of the District Suit, as required by the Westfield policies' notice provisions, which are conditions precedent to coverage.

d. The Westfield policies' exclusion for "contractual liability," exclusion **b.**, negates any coverage that might otherwise exist.

e. The Westfield policies' exclusion for "damage to property," exclusion **j.**, negates any coverage that might otherwise exist.

f. The Westfield policies' exclusion for "damage to your product," exclusion **k.**, negates any coverage that might otherwise exist.

g. The Westfield policies' exclusion for "damage to your work," exclusion **l.**, negates any coverage that might otherwise exist.

h. The Westfield policies' exclusion for "damage to impaired property or property not physically injured," exclusion **m.**, negates any coverage that might otherwise exist.

i. The Westfield policies' exclusion for "recall of products, work or impaired property," exclusion **n.**, negates any coverage that might otherwise exist.

j. The coverage for "damage to your work" provided by endorsement form no. AC-132 (1-90), contained in the Westfield policies in effect from January 2013 to January 2016 (*i.e.*, Exs. G, H, and I), does not apply because none of the damages alleged in the District complaint qualify as "property damage," as defined by the policies, but rather constitute mere economic loss.

k. The coverage for "damage to your work" provided by endorsement form no. AC-132 (1-90), contained in the Westfield policies in effect from January 2013 to January 2016 (*i.e.*, Exs. G, H, and I), does not apply because any damages which, *arguendo*, qualify as "property damage" alleged by the District Complaint are not alleged to have been "entirely the result of work performed on [Maxim's] behalf by a subcontractor," as required under subparagraph F.(1).

l.   The coverage for "damage to your work" provided by endorsement form no. AC-132 (1-90), contained in the Westfield policies in effect from January 2013 to January 2016 (*i.e.*, Exs. G, H, and I), does not apply because – as a matter of law – any "property damage" alleged by the District Complaint is not alleged to have been "unexpected and unintended from the standpoint of [Maxim]," as required under subparagraph F.(3).

36.   Westfield does not owe a duty to defend or indemnify Maxim under the Westfield policies' commercial umbrella coverage with respect to the District Suit for one or more of the following reasons, pleading hypothetically or in the alternative:

a.   The District Complaint does not allege any "occurrence," as it alleges only the natural and ordinary consequences of defectively performed work, rather than an accident.

b.   The District Complaint does not allege "property damage," as it alleges only economic losses in the form of the cost of repairing and replacing defective construction work.

c.   Maxim failed to provide timely notice to Westfield of the City Suit, as required by the Westfield policies' notice provisions, which are conditions precedent to coverage.

d.   The Westfield policies' exclusion for "contractual liability," exclusion **b.**, negates any coverage that might otherwise exist.

e.   The Westfield policies' exclusion for "damage to property," exclusion **m.**, negates any coverage that might otherwise exist.

f.   The Westfield policies' exclusion for "damage to your product," exclusion **n.**, negates any coverage that might otherwise exist.

g.   The Westfield policies' exclusion for "damage to your work," exclusion **o.**, negates any coverage that might otherwise exist.

h.   The Westfield policies' exclusion for "damage to impaired property or property not physically injured," exclusion **p.**, negates any coverage that might otherwise exist.

i.   The Westfield policies' exclusion for "recall of products, work or impaired property," exclusion **q.**, negates any coverage that might otherwise exist.

37.   There may be other bases on which Westfield can properly deny coverage, and

Westfield reserves the right to plead them in the future.

WHEREFORE, the Plaintiff, WESTFIELD INSURANCE COMPANY, prays that this Honorable Court enter an order finding and declaring that it does not owe a duty to defend or indemnify the Defendant, MAXIM CONSTRUCTION CORPORATION, INC., with respect to the underlying lawsuit filed by the Defendant, the LAKE COUNTY PUBLIC WATER DISTRICT, in the Circuit Court of the 19th Judicial Circuit, Lake County, Illinois, Cause No. 15 L 2627, under the commercial general liability and commercial umbrella coverage of Westfield Policy No. TRA 5284060, and for such other and further relief as this Court deems fair and just under the circumstances.

Respectfully submitted,
LINDSAY, RAPPAPORT & POSTEL, LLP

By: /s/ David S. Osborne

David S. Osborne (6237821)
Christopher J. Pickett (6287096)
Justin K. Seigler (6310143)
LINDSAY, RAPPAPORT & POSTEL, LLC
10 S. LaSalle St., Suite 1301
Chicago, Illinois 60603
Tel:  (312) 629-0208
Fax:  (312) 629-1404
dosborne@lrplawfirm.com
cpickett@lrplawfirm.com
jseigler@lrplawfirm.com
*Attorneys for Plaintiff Westfield Ins. Co.*