# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| WESTFIELD INSURANCE COMPANY | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | |
| MAXIM CONSTRUCTION CORPORATION, INC., | ) | No. 15 cv 9358 |
| and the CITY OF CRYSTAL LAKE, ILLINOIS, | ) | |
| | ) | |
| *Defendants*. | ) | |

**WESTFIELD'S MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Now comes the Plaintiff/Counterdefendant, Westfield Insurance Company ("Westfield"), by and through its attorneys, David S. Osborne and Lauren E. Rafferty of Lindsay, Pickett, Rappaport & Postel, LLC, and submits the following Memorandum of Law in support of its Motion for Summary Judgment, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure and Local Rule 56.1(a)(2), against Defendants Maxim Construction Corporation ("Maxim") and the City of Crystal lake, Illinois ("Crystal Lake").  In support hereof, Westfield states as follows:

# TABLE OF CONTENTS

**Page**

I.  WESTFIELD HAD NO DUTY TO DEFEND MAXIM IN THE *ENVIROGEN* CASE PRIOR TO THE FILING OF CRYSTAL LAKE'S CROSS-CLAIM THEREIN ........................................ 4

    A.    The Patent Infringement Claims in the Original *Envirogen* Complaint are Not Covered. ........................................ 5

    B.    Envirogen's Breach of Contract Claims did not Allege "Property Damage" Caused by an "Occurrence." ........................................ 5

    C.    Maxim Violated Westfield's Late Notice Clause ........................................ 7

    D.    Maxim Affirmatively Waived any Right to a Defense for the *Envirogen* Case. ........................................ 11

II.  THERE IS NO PRESENT CASE OR CONTROVERSY WITH REGARD TO WESTFIELD'S DUTY TO DEFEND MAXIM IN THE *CRYSTAL LAKE* SUIT, OR THE *ENVIROGEN* SUIT SUBSEQUENT TO CRYSTAL LAKE'S CROSS-CLAIM, BECAUSE WESTFIELD FULLY PERFORMED ANY SUCH ALLEGED DUTY. ........................................ 12

III.  THERE IS NO DUTY TO INDEMNIFY. ........................................ 16

IV.  THERE IS NO DUTY TO DEFEND THE *ENVIROGEN* APPEAL. ........................................ 17

    A.    The *Envirogen* Judgments Confirmed that the Only Claims at Issue were Always Purely Economic Loss, Not "Property Damage" Caused By An "Occurrence." ........................................ 19

    B.    Westfield Has No Duty to Procure or Pay for an Appeal Bond on Behalf of Maxim. ........................................ 22

V.  EVEN IF WESTFIELD HAD A DUTY TO DEFEND ONE OR MORE OF THE UNDERLYING CLAIMS, IT WOULD OWE NO DAMAGES FOR MAXIM'S DEFAULT JUDGMENTS ........................................ 23

    A.    Westfield Properly and Promptly Suspended Any Duty to Defend it May Otherwise Have Had by Seeking a Declaratory Judgment. ........................................ 25

    B.    Maxim Was the Sole Cause of its Own Default Judgment, and Could Have Easily Avoided That Unforeseeable Result By Communicating With Westfield in a Timely Manner. ........................................ 31

**C.** **Maxim's Own Claim of a Conflict of Interests Defeats Any Claim for Damages Caused by the Default Judgments.** ....................................................**34**

**D.** **Westfield's Actions were Timely.** ........................................................**36**

**IV.** **WESTFIELD IS ENTITLED TO SUMMARY JUDGMENT ON MAXIM'S SECTION 155 CLAIM**........ **38**

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*Addison Ins. Co. v. Fay*,
  905 N.E.2d 747 (Ill. 2009) .........................................................................4

*Allied Prop. & Cas. Ins. Co. v. Metro N. Condo. Ass'n*,
  850 F.3d 844 (7th Cir. 2017) .........................................6, 12, 16, 39

*Allstate Ins. Co. v. Mende*,
  176 A.D.2d 907, 575 N.Y.S.2d 520 (2d Dep't 1991).........................................21

*American States Ins. Co. v. National Cycle, Inc.*,
  631 N.E.2d 1292 (Ill.App. 1994) .........................................................37

*Amerisure Mut. Ins. Co. v. Microplastics, Inc.*,
  622 F.3d 806 (7th Cir. 2010) .........................................................6

*Baltimore Gas and Elec. Co. v. Commercial Union Ins. Co.*,
  113 Md.App. 540, 688 A.2d 496 (1997).........................................21

*Bell v. Hutsell*,
  955 N.E.2d 1099 (Ill. 2011) .........................................................28

*Carboline Co. v. Home Indem. Co.*,
  522 F.2d 363 (7th Cir. 1975) .........................................................18

*Case Prestressing Corp. v. Chicago Coll. of Osteopathic Med.*,
  455 N.E.2d 811 (Ill.App. 1983) .........................................................24

*Casualty Indem. Exchange v. Village of Crete*,
  731 F.2d 457 (7th Cir. 1984) .........................................................8, 10

*Central Mut. Ins. Co. v. Tracy's Treasures, Inc.*,
  19 N.E.3d 1100 (Ill.App. 2014) .........................................................40

*Certain Underwriters at Lloyd's, London v. Central Mut. Ins. Co.*,
  12 N.E.3d 762 (Ill.App. 2014) .........................................................37

*Charter Oak Fire Ins. Co. v. Snyder*,
  317 N.E.2d 307 (Ill.App. 1974) .........................................................8-10

*Charter Oak Fire Ins. Co. v. Sumitomo Marine and Fire Ins. Co., Ltd.*,
  750 F.2d 267 (3rd Cir. 1984) .........................................................21

*Cincinnati Ins. Co. v. Baur's Opera House, Inc.*,
  694 N.E.2d 593 (Ill.App. 1998) ................................................................3

*Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*,
  200 F.3d 1102 (7th Cir. 2000) ................................................................38

*City of Chicago v. U. S. Fire Ins. Co.*,
  260 N.E.2d 276 (Ill.App. 1970). ..............................................................9

*CMK Development Corp. v. West Bend Mut. Ins. Co.*,
  917 N.E.2d 1155 (Ill.App. 2009) ............................................................13

*Conway Chevrolet Buick, Inc. v. Travelers Indem. Co.*,
  136 F.3d 210 (1st Cir. 1998)............................................................21, 29

*Country Mutual Ins. Co. v. Livorsi Marine, Inc.*,
  856 N.E.2d 338 (Ill. 2006) ......................................................................7

*Crum & Forster Managers Corp. v. Resolution Trust Corp.*,
  620 N.E.2d 1073 (Ill. 1993) ...................................................................11

*Davila v. Arlasky*,
  857 F.Supp. 1258 (N.D.Ill. 1994) ............................................................5

*Doe v. Roe*,
  681 N.E.2d 640 (Ill.App. 1997) .............................................................24

*Eastern Shore Financial Resources, Ltd. v. Donegal Mut. Ins. Co.*,
  84 Md.App. 609, 581 A.2d 452 (1990)....................................................21

*Employers Ins. of Wausau v. EHLCO Liquidating Trust*,
  708 N.E.2d 1122 (Ill. 1999)....................................................................25

*Employers Reinsurance Corp. v. E. Miller Insurance Agency*,
  773 N.E.2d 707 (Ill.App. 2002) .............................................................37

*Equity General Insurance Co. v. Patis*,
  456 N.E.2d 348 (Ill.App. 1983) ..........................................................9, 10

*Fichtel v. Board of Directors of River Shore of Naperville Condominium Ass'n*,
  907 N.E.2d 903 (Ill.App. 2009) .........................................................28, 29

*First Trust & Savings Bank v. Skokie Federal Savings & Loan Association*,
  466 N.E.2d 1048 (Ill.App. 1984) ............................................................11

iv

*Fleisher & Falkenberg, LLC*,
  822 F.3d 358 (7th Cir. 2016) ..................................................................................6

*Furtak v. Moffett*,
  671 N.E.2d 827 (Ill.App. 1996) .........................................................................29

*General Cas. Co. of Wis. v. Whipple*,
  328 F.2d 353 (7th Cir. 1964) ...............................................................................17

*Graf v. Hospitality Mutual Insurance Co.*,
  956 F.Supp.2d 337 (D.Mass. 2013) ..................................................................22

 *Gross v. Town of Cicero*,
  528 F.3d 498 (7th Cir. 2008).  ...........................................................................11

*Hadley v. Baxendale*,
  9 Ex. 341, 156 Eng. Rep. 145 (1854)..................................................................24

*Harrington v. Kay*,
  483 N.E.2d 560 (Ill.App. 1985). .........................................................................11

*Hartford Cas. Ins. Co. v. ContextMedia, Inc.*,
  65 F.Supp.3d 570 (N.D.Ill. 2014) ......................................................................27

*Hartford Cas. Ins. Co. v. Karlin, Fleisher & Falkenberg, LLC*,
  822 F.3d 358 (7th Cir. 2016) ..................................................................................6

*Hartford Cas. Ins. Co. v. Snyders*,
  506 N.E.2d 627 (Ill.App. 1987) ...........................................................................9

*Health Care Industry Liability Ins. Program v. Momence Meadows Nursing Center, Inc.*,
  566 F.3d 689 (7th Cir. 2009) ..............................................................................39

*Holstein v. City of Chicago*,
  29 F.3d 1145 (7th Cir. 1994).  ...........................................................................15

*Home Ins. Co. v. Am. Nat. Can Co.*,
  97 C 0975, 1997 WL 467180 (N.D.Ill. Aug. 12, 1997).........................................5

*Home Ins. Co. v. U.S. Fidelity and Guar. Co.*,
  755 N.E.2d 122 (Ill.App. 2001) .................................................................. 37-38

*Illinois Valley Minerals Corp. v. Royal-Globe Ins. Co.*,
  388 N.E.2d 253 (Ill.App. 1979) .....................................................................9, 10

*Illinois Founders Ins. Co. v. Guidish*,
    618 N.E.2d 436 (Ill.App. 1993) ..................................................................17. 18

*Illinois Ins. Guar. Fund v. Santucci*,
    894 N.E.2d 801 (Ill.App. 2008) .................................................................27

*IMC Global v. Continental Ins. Co.*,
    883 N.E.2d 68 (Ill.App. 2007) .............................................................. 26-27

*INA Insurance Co. v. City of Chicago*,
    379 N.E.2d 34 (Ill.App. 1978) ..............................................................9, 10

*International Harvester Co. v. Continental Cas. Co.*,
    179 N.E.2d 833 (Ill.App. 1962) ...............................................................10

*James River Ins. Co. v. Interlachen Propertyowners Ass'n*,
    CV 14-3434 ADM/LIB, 2016 WL 3093383 (D.Minn. June 1, 2016) ............................ 22

*Krueger Int'l, Inc. v. Royal Indem. Co.*,
    481 F.3d 993 (7th Cir. 2007) .....................................................................6

*L.A. Connection v. Penn-America Insurance Co.*,
    843 N.E.2d 427 (Ill.App. 2006) ...............................................................37

*Lagestee-Mulder, Inc. v. Consolidated Ins. Co.*,
    682 F.3d 1054 (7th Cir. 2012) .............................................................6, 13

*Lee v. Aetna Cas. & Surety Co.*,
    178 F.2d 750 (2nd Cir. 1949) ..............................................................19, 20

*Lincoln Park Arms Bldg. Corporation, for Use of Schroeder v. U.S. Fidelity & Guaranty Co.*,
    5 N.E.2d 773 (Ill.App. 1936) ...................................................................17

*Littlefield v. McGuffey*,
    979 F.2d 101 (7th Cir. 1992) ...................................................................35

*Lockwood Intern., B.V. v. Volm Bag Co., Inc.*,
    273 F.3d 741 (7th Cir. 2001) ...................................................................19

*Martin v. Heinold Commodities, Inc.*,
    643 N.E.2d 734 (Ill. 1994). .....................................................................24

*Martin v. State Farm Mut. Auto. Ins. Co.*,
    808 N.E.2d 47 (Ill.App. 2004) .................................................................29

*Maryland Casualty Co. v. Peppers*,
   355 N.E.2d 24 (Ill. 1976) ...................................................................19, 40

*May Dept. Stores Co. v. Fed. Ins. Co.*,
   305 F.3d 597 (7th Cir. 2002) ........................................................................6

*McCook Metals, L.L.C.*,
   07 C 0621, 2007 WL 1687262 (N.D.Ill. June 7, 2007) ..................................18

*Meadowbrook, Inc. v. Tower Ins. Co., Inc.*,
   559 N.W.2d 411 (Minn. 1997)......................................................................21

*Medmarc Cas. Ins. Co. v. Avent America, Inc.*,
   612 F.3d 607 (7th Cir. 2010) .......................................................................39

*Montgomery Ward and Co., Inc. v. Home Ins. Co.*,
   753 N.E.2d 999 (Ill.App. 2001) .....................................................................9

*Moon v. Cincinnati Ins. Co.*,
   975 F.Supp.2d 1326 (N.D.Ga. 2013) ...........................................................29

*Murphy v. Urso*,
   430 N.E.2d 1079 (Ill. 1981) ........................................................................35

*Nat'l Union Fire Ins. Co. of Pittsburgh v. Associates in Adolescent Psychiatry*,
   86 C 4959, 1987 WL 12661 (N.D.Ill. June 18, 1987) ...................................18

*Nautilus Ins. Co. v. Bd. of Directors of Regal Lofts Condo. Ass'n*,
   764 F.3d 726 (7th Cir. 2014) .........................................................................3

*Northern Ins. Co. of New York v. City of Chicago*,
   759 N.E.2d 144 (Ill.App. 2001) .....................................................................9

*O'Brien v. R.J. O'Brien & Associates, Inc.*,
   998 F.2d 1394 (7th Cir. 1993) .....................................................................39

*Pekin Ins. Co. v. Precision Dose, Inc.*,
   968 N.E.2d 664 (Ill.App. 2012) .....................................................................4

*Philadelphia Indem. Ins. Co. v. Chicago Title Ins. Co.*,
   771 F.3d 391 (7th Cir. 2014) ...........................................................3, 17, 20

*Reller, Inc. v. Hartford Ins. Co. of the Southeast*,
   765 So.2d 87 (Fla.App. 2000).....................................................................21

*River v. Commercial Life Ins. Co.*,
    160 F.3d 1164 (7th Cir. 1998) ..................................................................8

*Santa's Best Craft, L.L.C. v. Zurich American Ins. Co.*,
    941 N.E.2d 291 (Ill.App. 2010) ..........................................................30, 35

*Scottsdale Ins. Co. v. Walsh Const. Co.*,
    10 C 1565, 2011 WL 4538456 (N.D.Ill. Sept. 29, 2011) ................................28

*Sears, Roebuck & Co. v. Employers Ins. of Wausau*,
    585 F.Supp. 739 (N.D.Ill. 1983) ...........................................................18

*Sears, Roebuck and Co. v. Mutual Insurance Co.*,
    199 F.Supp. 769 (N.D.Ill.1961) ............................................................18

*Sears, Roebuck and Co. v. Reliance Ins. Co.*,
    654 F.2d 494 (7th Cir.1981) ...............................................................19

*Sears, Roebuck and Co. v. Seneca Ins. Co.*,
    627 N.E.2d 173 (Ill.App. 1993) ............................................................37

*Sears, Roebuck & Co. v. Travelers Insurance Co.*,
    261 F.2d 774 (7th Cir. 1958) ...............................................................18

*Sears, Roebuck & Co. v. Zurich Ins. Co.*,
    321 F.Supp. 1350 (N.D.Ill. 1971) .........................................................18

*Seltzer v. Barnes*,
    182 Cal.App.4th 953, 106 Cal.Rptr. 3d 290 (1st Dist. 2010) ...........................21

*Solo Cup Co. v. Fed. Ins. Co.*,
    619 F.2d 1178 (7th Cir. 1980) ........................................................18, 20

*State Auto. Mut. Ins. Co. v. Kingsport Development, LLC*,
    846 N.E.2d 974 (Ill.App. 2006) ............................................................37

*State Farm Fire & Cas. Co. v. Martin*,
    710 N.E.2d 1228 (Ill. 1999) ...........................................................25, 26

*Stoneridge Dev. Co., Inc. v. Essex Ins. Co.*,
    888 N.E.2d 633 (Ill.App. 2008) .......................................................13, 36

*Sturges Mfg. Co. v. Utica Mut. Ins. Co.*,
    37 N.Y.2d 69, 332 N.E.2d 319 (1975) .....................................................20

*Sun Elec. Corp. v. St. Paul Fire & Marine Ins. Co.*,
    94-C-5846, 1995 WL 270230 (N.D.Ill. May 4, 1995)....................................................18

*Taco Bell Corp. v. Cont'l Cas. Co.*,
    01 C 0438, 2003 WL 1475035 (N.D.Ill. Mar. 17, 2003),
    *affirmed in relevant part*, 388 F.3d 1069 (7th Cir. 2004)....................................28

*Tews Funeral Home, Inc. v. Ohio Cas. Ins. Co.*,
    832 F.2d 1037 (7th Cir. 1987) ........................................................................18

*Those Certain Underwriters at Lloyd's v. Prof'l Underwriters Agency, Inc.*,
    848 N.E.2d 597 (Ill.App. 2006) .................................................................25, 26

*TIG Ins. Co. v. Canel*,
    906 N.E.2d 621 (Ill.App. 2009) .......................................................................18

*TIG Ins. Co. v. Giffin Winning Cohen & Bodewes, P.C.*,
    444 F.3d 587 (7th Cir. 2006) ...........................................................................24

*TIG Ins. Co. v. Joe Rizza Lincoln-Mercury, Inc.*,
    00 C 5182, 2002 WL 406982 (N.D.Ill. Mar. 14, 2002) ....................................28

*Transamerica Ins. Co. v. Interstate Pollution Control*,
    No. 92 cv 20247, 1995 WL 360460 (N.D.Ill. Jun. 16, 1995) ............................10

*Travelers Ins. Co. v. Eljer Mfg., Inc.*,
    757 N.E.2d 481 (Ill. 2001)............................................................................6, 13

*Tri-Etch, Inc. v. Cincinnati Ins Co.*,
    909 N.E.2d 997 (Ind. 2009) ...............................................................................8

*Twin City Fire Insurance Co. v. Old World Trading Co.*,
    639 N.E.2d 584 (Ill.App. 1993) ..........................................................................8

*UIDC Management, Inc. v. Sears, Roebuck and Co.*,
    520 N.E.2d 1164 (Ill.App. 1988) ......................................................................12

*United Fire & Cas. Co. v. Shelly Funeral Home, Inc.*,
    642 N.W.2d 648 (Iowa 2002) ...........................................................................23

*Universal Underwriters Ins. Co. v. LKQ Smart Parts, Inc.*,
    963 N.E.2d 930 (Ill.App. 2011) ..................................................................25-26

*U.S. Fire Ins. Co. v. Zurich Ins. Co.*,
    768 N.E.2d 288 (Ill.App. 2002) ........................................................................29

ix

*Wackenhut Services, Inc. v. National Union Fire Ins. Co. of Pittsburgh, PA*,
    15 F.Supp.2d 1314 (S.D.Fla. 1998) ...................................................................21

*Walker v. Ridgeview Construction Co.*,
    736 N.E.2d 1184 (Ill.App. 2000). ...................................................................24

*Waste Management, Inc. v. Int'l Surplus Lines Ins. Co.*,
    579 N.E.2d 322 (Ill. 1991) ...................................................................26

*Westchester Fire Ins. Co. v. G. Heileman Brewing Co., Inc.*,
    747 N.E.2d 955 (Ill.App. 2001) ...................................................................37

*Western Chain Co. v. American Mutual Liability Ins. Co.*,
    386 F.Supp. 440 (N.D.Ill. 1974). ...................................................................10

*Westfield Ins. Co. v. West Van Buren, LLC*,
    59 N.E.3d 877 (Ill.App. 2016) ...................................................................13, 19

*Wiegert-Stathes v. American Family Mut. Ins. Co.*,
    A-08-1041, 2009 WL 3381578 (Neb.App. Oct. 20, 2009) ...............................................22

## Statutes

215 ILCS §5/155     ...................................................................38

## Secondary Sources

14 COUCH ON INSURANCE § 200:46 ...................................................................22

DUTY OF LIABILITY INSURER TO APPEAL,
    69 A.L.R.2d 690...................................................................17

BACKGROUND AND SUMMARY

As stated in more detail in its Local Rule 56.1(a)(3) statement of material facts ("WSOF"), there are three separate underlying lawsuits at issue which were filed against Maxim: (1) an underlying state court action filed by Crystal Lake ("the *Crystal Lake* state court case"), (2) a separate underlying federal lawsuit filed by Envirogen Technologies, Inc. ("Envirogen") ("the *Envirogen* case"), and a third underlying lawsuit, *Lake Co. Public Water Dist. v. Maxim, et al.*, case no. 15 L 2627, also filed in Illinois state court ("the *Lake County* case"). Maxim subsequently withdrew its tender of defense in the *Lake County* case (WSOF 55).[1]

Both the *Crystal Lake* case and the *Envirogen* case arose out of Maxim's construction and installation of an allegedly defective water treatment system for the City of Crystal Lake, Illinois (WSOF 8, 14). Envirogen was the manufacturer of the water treatment system that Maxim was hired to install for Crystal Lake (WSOF 9). Maxim apparently failed to pay Envirogen for the system, because on March 25, 2014, Envirogen sued Maxim for the purchase price, as well as patent infringement (for using its patented water treatment system without paying for it) (WSOF 7-13).

Maxim hired counsel to defend itself in the *Envirogen* case, and did not give notice of the suit to Westfield or in any other way indicate that it sought a defense from Westfield (WSOF 11, 25). The *Envirogen* suit proceeded before Judge Zagel in this District, and Maxim defended itself in that case for 17 months without giving notice to Westfield at all, apparently cognizant that such a claim is not even arguably within the scope of a Commercial General Liability ("CGL") policy, such as that at issue here (WSOF 7, 11, 25).

On June 25, 2015, Crystal Lake filed suit against Maxim in Illinois state court, asserting

---

[1] In the event Maxim attempts to revive its tender of defense and indemnity in the *Lake County* case, Westfield reserves the right to seek a declaration that it has no such duty.

that the Envirogen system that it bought from Maxim simply did not function, despite numerous efforts at remediation ("*Crystal Lake*") (WSOF 14, 15). Maxim retained its own attorneys, which appeared in the *Crystal Lake* case on September 8, 2015 and began defending it (WSOF 15).

On August 27, 2015, Maxim for the first time tendered both the *Crystal Lake* case and the *Envirogen* case to Westfield for defense, as well as the *Lake County* case (WSOF 25). Less than two months later, on October 20, 2015, Westfield sought a declaratory judgment from this Court that it had no duty to defend or indemnify Maxim in any of the three underlying suits (Dkt. 1).

On December 2, 2015, Crystal Lake filed a Cross-Claim against Maxim in the *Envirogen* case (WSOF 18). The next day, it dismissed its case against Maxim in state court (WSOF 19). Maxim notified Westfield of neither of these events at the time (WSOF 20).

Maxim filed its motion for summary judgment herein on June 8, 2016 (Dkt. 35). Maxim omitted any argument in support of its claim that Westfield owed a duty to defend the *Lake County* case, or any duty to defend Envirogen's claims, and instead argued only that Crystal Lake's claims triggered Westfield's duty to defend (Dkt. 35-1). It also disclosed for the first time – almost in passing – that Crystal Lake had filed a Cross-Claim against it in the *Envirogen* case, but did not provide that pleading to Westfield or even seek to introduce it into the record in this case (Dkt. 35-1 at 2; WSOF 28-29).

Nine days later, Westfield agreed to undertake Maxim's defense in the *Crystal Lake* and *Envirogen* cases and soon thereafter voluntarily remitted payment to Maxim for all defense fees and costs incurred in the *Crystal Lake* state court case and for defense fees and costs incurred subsequent to the filing of Crystal Lake's cross-claim in the *Envirogen* case, thus satisfying all claims made by Maxim in its motion for summary judgment (WSOF 32-56).

Not content with a complete resolution of the only claim it pressed in its motion for

summary judgment, Maxim demanded that its motion be fully briefed and resolved (Dkt. 57).  In an effort to find some basis to perpetuate the dispute, Maxim for the first time in its Reply argued that Westfield had a duty to defend Envirogen's claims for the unpaid purchase price of the water treatment system that it sold Maxim (Dkt. 64 at 4, 6-9).  It also argued that Westfield is responsible for Maxim's failure to defend the underlying case, resulting in default judgments against it, and that Westfield has a duty to prosecute an appeal from the default judgments (Dkt. 64; Dkt. 81).  Finally, Maxim argues that Westfield owes a duty to indemnify it for the default judgments.  Each of these assertions will be addressed below.

## ARGUMENT

The foundation of Maxim's claim is that the *Crystal Lake* case in state court and the federal *Envirogen* case were "consolidated," and that because they are "related," they should be treated as one, apparently solely in an effort to exaggerate the "delay" on the part of Westfield, upon which it bases its arguments (Dkt. 70 at 4, 9-10, pars. 24, 63; Dkt. 77-1 at 1, par. 5; Dkt. 81 at 5).  On the contrary, no matter how "related" the two cases may be, the coverage issues must be evaluated separately. *Cincinnati Ins. Co. v. Baur's Opera House, Inc.*, 694 N.E.2d 593, 595 (Ill.App. 1998).

Even in the course of a single case, the Court evaluates the duty to defend separately as to each version of each pleading which is alleged to trigger coverage.  Where there are multiple versions of the underlying complaint, the duty to defend each segment of the case is determined *separately* under each version. See: *Nautilus Ins. Co. v. Bd. of Directors of Regal Lofts Condo. Ass'n*, 764 F.3d 726, 732 (7th Cir. 2014) (criticizing argument which attempted to "circumvent this clear principle of law by inexactly describing the disposition below, referring to the 'Underlying Complaints' collectively…"); *Philadelphia Indem. Ins. Co. v. Chicago Title Ins. Co*., 771 F.3d 391, 402 (7th Cir. 2014) (recognizing that even where there is a duty to defend, the duty may be

3

extinguished where the claim is "confined" to non-covered claims through partial dismissal or amendment).

Under Illinois law, as the party seeking coverage, the insured bears the burden of proof in establishing coverage. *Addison Ins. Co. v. Fay*, 905 N.E.2d 747, 752 (Ill. 2009). An insured must affirmatively argue and prove the duty to defend under each version of the complaint. See: *Pekin Ins. Co. v. Precision Dose, Inc.*, 968 N.E.2d 664, 668 (Ill.App. 2012) ("We conclude that defendants have procedurally defaulted any argument regarding whether Pekin owed a duty to defend the original complaint. *** Accordingly, we need address only the amended complaint…").

It is clearly inappropriate to view the underlying state and federal cases, and all versions of the underlying pleadings in each, as one "consolidated" claim which requires a single resolution of the duty to defend. Instead, the Court must evaluate each distinct pleading separately. The distinct phases of litigation which are at issue here are as follows: (1) the initial *Envirogen* claim against Maxim in this District; (2) the state court *Crystal Lake* case against Maxim; (3) the *Envirogen* case subsequent to Crystal Lake's Cross-Claim against Maxim; and (4) the appeal from the *Envirogen* judgment.

In addition to the duty to defend, the Court must now determine whether there is a duty to indemnify Maxim for the judgments which were entered against Maxim and in favor of Crystal Lake and Envirogen. Each of these issues will be addressed in turn.

I.   **WESTFIELD HAD NO DUTY TO DEFEND MAXIM IN THE *ENVIROGEN* CASE PRIOR TO THE FILING OF CRYSTAL LAKE'S CROSS-CLAIM THEREIN.**

Westfield had no duty to defend Maxim in the *Envirogen* suit prior to the Cross-Claim because (a) patent infringement claims are outside the scope of Westfield's Personal and Advertising Injury coverage, and, in fact, specifically excluded; (b) contract claims for economic loss are not "Property Damage" caused by an "Occurrence," for purposes of the Property Damage

4

coverage in Westfield's standard-form CGL policies; and (c) Maxim failed to comply with the Westfield policies' notice requirements, which are conditions precedent to coverage.[2]

**A.      The Patent Infringement Claims in the Original _Envirogen_ Complaint are Not Covered.**

In the first iteration of its complaint, Envirogen asserted three counts for patent infringement against Maxim, based upon its use of the Envirogen system without paying for it (WSOF 8, 10).   These are plainly not claims for "property damage" or "bodily injury."   The Westfield policy does provide a separate form of coverage for Personal and Advertising Injury, but courts have consistently held that patent infringement claims are outside the scope of such coverage. _Home Ins. Co. v. Am. Nat. Can Co._, 97 C 0975, 1997 WL 467180, *2 (N.D.Ill. Aug. 12, 1997) ("[N]umerous other courts have construed nearly identical language and have held that patent infringement is not covered by Advertising Injury.*** I agree with these cases…"); _Davila v. Arlasky_, 857 F.Supp. 1258, 1263 (N.D.Ill. 1994) ("We agree with the majority of the courts which have considered the issue that patent infringement is not advertising injury and does not give rise to advertising liability under the policies here involved").   Since the time these cases were decided, patent infringement has been explicitly excluded from standard-form CGL policies, and that is true here (WSOF 80).   Maxim has explicitly conceded that the patent infringement claims do not trigger Westfield's duty to defend (WSOF 57).   As such, there should be no further dispute over this issue, and Westfield includes this argument only in the event that Maxim seeks to reverse its previously-taken position in this regard, as it has on other issues.

**B.      Envirogen's Breach of Contract Claims did not Allege "Property Damage" Caused by an "Occurrence."**

After Envirogen dismissed its patent claims against Maxim, the only remaining claims in

---

[2] The Westfield policies' Umbrella sections contain terms indistinguishable from the CGL terms, for purposes of Westfield's argument herein, and so will not be argued separately (WSOF 81).

the First and Second Amended Complaints against Maxim were for breach of contract for failure to pay the purchase price of the water treatment system (WSOF 12-13, 17). Such purely economic losses do not constitute "property damage" caused by an "occurrence" (defined as an "accident") (WSOF 80). Economic loss simply is not covered as "property damage" under a CGL policy, regardless of whether it has some connection to "property." See, e.g.: *Travelers Ins. Co. v. Eljer Mfg., Inc.*, 757 N.E.2d 481, 489 (Ill. 2001); *Allied Prop. & Cas. Ins. Co. v. Metro N. Condo. Ass'n*, 850 F.3d 844, 848 (7th Cir. 2017); *Amerisure Mut. Ins. Co. v. Microplastics, Inc.*, 622 F.3d 806, 811-15 (7th Cir. 2010); *Lagestee-Mulder, Inc. v. Consolidated Ins. Co.*, 682 F.3d 1054, 1057 (7th Cir. 2012).

Moreover, there simply is no way to "insure" Maxim's failure to pay for goods that it has purchased, in light of the acute moral hazard inherent in such a transaction. See, e.g.: *Hartford Cas. Ins. Co. v. Karlin, Fleisher & Falkenberg, LLC*, 822 F.3d 358, 360 (7th Cir. 2016) ("It would be absurd for an insurance company to insure against a breach of a contract to, say, buy a car, for then the insured could take delivery of the car, refuse to pay for it, and require the insurer to reimburse the seller for the car's sale price and the cost of litigation"); *Krueger Int'l, Inc. v. Royal Indem. Co.*, 481 F.3d 993, 996 (7th Cir. 2007) (Wisconsin law) (citing as an example of uninsurable "moral hazard" a situation where "having somehow persuaded an insurance company to insure you against liability for breach of contract, you hire a contractor to build an extension on your house and after he has completed his work you refuse to pay him, and, when he sues, you turn his claim over to the insurance company"); *May Dept. Stores Co. v. Fed. Ins. Co.*, 305 F.3d 597, 601 (7th Cir. 2002) (proposition that insurer would agree to cover insured employer against underpayment of pension benefits implausible in light of inherent moral hazard). Maxim's purchase of a CGL policy does not relieve it of the obligation to pay its bills.

It is undisputed that Envirogen's patent infringement claims do not trigger Westfield's duty to defend. The breach of contract allegations in the *Envirogen* case allege only economic loss as a result of Maxim's refusal to pay for the water treatment system it purchased from Envirogen. Such a claim does not amount to "property damage" caused by an "occurrence," and is, in any event, inherently uninsurable. Therefore, Envirogen's allegations do not trigger any duty to defend and the Court should enter summary judgment in favor of Westfield on this basis.

### C.    Maxim Violated Westfield's Late Notice Clause.

Even if Westfield otherwise had a duty to defend Maxim against Envirogen's patent infringement and breach of contract claims, Maxim's failure to comply with the notice provisions in the Westfield policies obviates any such duty. Envirogen filed suit on March 25, 2014, but Maxim did not give first notice to Westfield of the suit (much less of the alleged occurrence which gave rise to it) until August 27, 2015. (WSOF 7, 25).

The "Late Notice" clauses in Westfield's policies provide, in pertinent part, that if a "'suit' is brought against any insured, [Maxim] must…[n]otify [Westfield] as soon as practicable," and reiterates that that Maxim "must see to it that we receive written notice of the claim or 'suit' as soon as practicable." (WSOF 80). It further requires that Maxim "must…[i]mmediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or 'suit.'" (WSOF 80).

Such late notice clauses "impose valid prerequisites to insurance coverage." *Country Mutual Ins. Co. v. Livorsi Marine, Inc*., 856 N.E.2d 338, 343 (Ill. 2006). The breach of such a clause "by failing to give reasonable notice will defeat the right of the insured party to recover under the policy." *Id*. The duty to give an insurer prompt notice of a lawsuit is a condition precedent to coverage, whether the insurer is prejudiced or not. *Livorsi*, 856 N.E.2d at 346-48; *see*

also: *Tri-Etch, Inc. v. Cincinnati Ins Co.*, 909 N.E.2d 997, 1005 (Ind. 2009) ("There is no reason why an insurer should be required to forego a notice requirement simply because it has other valid defenses to coverage").

The *Livorsi* Court identified the following five factors for consideration of the reasonableness issue: (1) the specific language of the Policy's notice provision; (2) the degree of the insured's sophistication in the world of commerce and insurance; (3) the insured's awareness that a "lawsuit" as defined under the terms of the Policy has taken place; (4) once this awareness arises, the insured's diligence and reasonable care in ascertaining whether the Policy coverage is available; and (5) the presence or absence of prejudice to the insurer. *Id.* All of these factors weigh conclusively against Maxim here.

The test for what is a reasonable delay is measured from the moment that a reasonably prudent person in the insured's position would foresee a lawsuit and would contact his attorney or liability insurer. *Twin City Fire Insurance Co. v. Old World Trading Co.*, 639 N.E.2d 584, 588 (Ill.App. 1993). In this case, Maxim contacted its attorneys to represent it in the *Envirogen* case no later than April 17, 2014, because that is the date they filed their appearances on behalf of Maxim therein (WSOF 11). Maxim, however, did not give Westfield any notice of the suit until August 27, 2015 (WSOF 25). Absent some compelling excuse, a delay of such length is far too long to be considered reasonable, as a matter of law.

As the Seventh Circuit has put it, "a delay of even a few months in giving notice breaches the policy as a matter of law, defeats coverage, and justifies the entry of summary judgment for the insurance company." *River v. Commercial Life Ins. Co.*, 160 F.3d 1164, 1170 (7th Cir. 1998); see also: *Casualty Indem. Exchange v. Village of Crete*, 731 F.2d 457, 459 (7th Cir. 1984) (five-month delay after suit filed unreasonable as a matter of law); *Charter Oak Fire Ins. Co. v. Snyder*,

317 N.E.2d 307, 311 (Ill.App. 1974) (four-month delay unreasonable); *INA Insurance Co. v. City of Chicago*, 379 N.E.2d 34, 38 (Ill.App. 1978) (three months unreasonable); *Equity General Insurance Co. v. Patis*, 456 N.E.2d 348, 352 (Ill.App. 1983) (four and one-half months unreasonable); *Illinois Valley Minerals Corp. v. Royal-Globe Ins. Co.*, 388 N.E.2d 253, 257 (Ill.App. 1979) (six-month delay in giving notice after accident, but prior even to suit being filed, unreasonable as a matter of law); *Hartford Cas. Ins. Co. v. Snyders*, 506 N.E.2d 627, 629 (Ill.App. 1987) (seven-month delay unreasonable); *Montgomery Ward and Co., Inc. v. Home Ins. Co.*, 753 N.E.2d 999, 1005 (Ill.App. 2001) ("eight-month or year-long delay in giving notice to [insurer] constitutes late notice").

In order to operate as an effective excuse for late notice, lack of knowledge must be "without negligence or fault on the part of the person seeking to be excused." *City of Chicago v. U. S. Fire Ins. Co.*, 260 N.E.2d 276, 280 (Ill.App. 1970). When the facts are undisputed, the determination of whether the insured used due diligence is an issue of law. *Northern Ins. Co. of New York v. City of Chicago*, 759 N.E.2d 144, 149 (Ill.App. 2001).

In addition to the underlying cases at issue here, Maxim is a frequent litigant in this District,[3] as well as in Illinois state court.[4] As a corporation with a demonstrated capability of

---

[3] See: *Pension Fund, Local 502, et al. v. Maxim Construction Corporation, Inc.*, Case No. 1:16-cv-5612 (N.D.Ill.); *Trustees of the Chicago Regional Council of Carpenters Pension Fund, et al. v. Maxim Construction Corporation, Inc.*, Case No. 1:16-cv-4239 (N.D.Ill.); *Trustees of the Pension Welfare and Vacation Fringe Benefit Funds of IBEW Local 701 v. Stellmach Electric, Inc., et al.*, Case No.1:14-cv-02890 (N.D.Ill.); *Trustees of The Chicago Regional Council Of Carpenters Pension Fund et al. v. Maxim Construction Corporation, Inc.*, Case No. 1:14-cv-02591 (N.D.Ill.); *Laborers' Pension and Laborers' Welfare Fund, et al. v. Maxim Construction Corporation, Inc.*, Case No. 1:14-cv-2239 (N.D.Ill.); *Carpenters Fringe Benefit Funds of Illinois, et al. v. Maxim Construction Corporation, Inc.*, Case No. 1:14-cv-05235 (N.D.Ill.).
[4] See: *Mid-American Water v. Maxim Construction Corporation, Inc., et al. v. Maxim Construction Corporation, Inc., et al.*, Cause No. 2014 CH 10315 (Cook County, Illinois) (cons.); *Cabo Construction Corp. v. The City of Wood Dale, et al.*, Cause No. 2014 CH 00386 (DuPage County, Illinois) (cons.); *Maxim Construction Corporation, Inc.v. The Lindenhurst Sanitary District*, Case No. 13 L 10 (Lake County, Illinois) (cons.); *Linear Electric Company, Inc. v. Maxim Construction Corporation, et al.*, Cause No. 16 L 2900 (Cook County, Illinois); *Olsen Oil v. Maxim Construction Corp.*, Cause No. 14 SC 5663 (Lake

hiring its own multiple legal teams, Maxim obviously had the resources it needed to tender the *Envirogen* suit to Westfield immediately, and should not be excused from that critical duty. *International Harvester Co. v. Continental Cas. Co.*, 179 N.E.2d 833, 836 (Ill.App. 1962); *Transamerica Ins. Co. v. Interstate Pollution Control*, No. 92 cv 20247, 1995 WL 360460, *15 (N.D.Ill. Jun. 16, 1995); *Western Chain Co. v. American Mutual Liability Ins. Co.*, 386 F.Supp. 440, 442 (N.D.Ill. 1974).

Maxim cannot deny that it was imperative for it to make a claim for defense and indemnity immediately, if it wished to preserve those rights. Maxim's failure to give any excuse for its delay in giving notice of the *Envirogen* lawsuit to Westfield in its Affirmative Defenses or Counterclaim should be conclusive (Dkt. 70; 83). Maxim knowingly took its fortunes in the *Envirogen* case into its own hands. The Court should not relieve it of the consequences of that decision.

It is also undisputed that the *Crystal Lake* Cross-Claim was filed in the *Envirogen* case on December 2, 2015, but that Westfield did not receive notice of it until June 8, 2016, when Maxim made a mere passing reference to it in its motion for summary judgment in this case, without even forwarding the document to Westfield (WSOF 18, 20, 27-29). That was six months after the pleading was filed, which is clearly not a reasonable delay, under well-established Illinois law. *Village of Crete*, 731 F.2d at 459; *Snyder*, 317 N.E.2d at 311; *City of Chicago*, 379 N.E.2d at 38; *Patis*, 456 N.E.2d at 352 (Ill.App. 1983); *Illinois Valley Minerals*, 388 N.E.2d at 257.

Maxim's delay in giving notice of the *Envirogen* suit or the Crystal Lake Cross-Claim therein was unreasonable on its face and, as such, Maxim breached the notice of suit provisions of

---

County, Illinois); *Morse Electric v. Maxim Construction Corp*., Cause No. 13 LM 21 (Warren County, Illinois); *Maneval Construction v. Maxim Construction Corp*., Cause No. 13 AR 931 (Lake County, Illinois); *Dynacoil Inc. v. Village of Fox Lake and Maxim Construction Corp.*, Cause No. 13 CH 2242 (Lake County, Illinois); *Virfran, Inc., d/b/a Dunn Lumber and True Value, Inc v. Maxim Construction Corporation, Inc., et al*., Cause No. 13 CH 0596 (Lake County, Illinois); *Lake County v. Daniel Sjong, et al.*, Cause No. 13 OV 1276 (Lake County, Illinois).

its policies. Westfield, therefore, has no duty to defend Maxim for the *Envirogen* suit and the Court should grant summary judgment in its favor accordingly.

### D.    Maxim Affirmatively Waived any Right to a Defense for the *Envirogen* Case.

Even as late as October 14, 2016, four months after it filed its motion for summary judgment herein, when asked by Westfield to assert whether there was any remaining case or controversy following Westfield's payments of all defense fees and costs argued by Maxim therein, it stated that it was "still considering our options regarding…costs in the *Envirogen* case prior to the December 2, 2015 cross-claim by the City of Crystal Lake." (WSOF 55).

For the first time in its Reply in support of its motion for summary judgment, on January 23, 2017, Maxim argued that it "does indeed believe that WESTFIELD should pay its defense fees and costs incurred in the *Envirogen* suit prior to the filing of Crystal Lake's cross-claim…" (Dkt. 64 at 3-4). No legal authority or factual basis has ever been advanced in support of this new "belief." (Dkt. 64 at 4-5; Dkt. 70 at 4, 7, 9-10, pars. 22, 56, 63-68).

Waiver is a voluntary relinquishment of a known right. *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 620 N.E.2d 1073, 1080 (Ill. 1993). It may be express or implied, arising from acts, words, conduct, or knowledge of the one waiving the right. *Id*. It may also be inferred from delay in asserting a right. *First Trust & Savings Bank v. Skokie Federal Savings & Loan Association*, 466 N.E.2d 1048, 1050 (Ill.App. 1984). "[A]n implied waiver of a legal right may arise when the conduct of the person against whom the waiver is asserted is inconsistent with any other intention than to waive it." *Harrington v. Kay*, 483 N.E.2d 560, 564 (Ill.App. 1985).

As everyone knows – certainly a sophisticated litigant like Maxim – there is an inherent urgency to any litigation. As Judge Easterbrook has put it, "[t]he law is full of deadlines, and delay can lead to forfeiture." *Gross v. Town of Cicero*, 528 F.3d 498, 500 (7th Cir. 2008). "Waiver

commonly occurs in situations where a party to a contract has the right to expect certain performance within a definite period of time." *UIDC Management, Inc. v. Sears, Roebuck and Co.*, 520 N.E.2d 1164, 1167 (Ill.App. 1988). If Maxim intended to demand a defense from Westfield in the *Envirogen* case, it surely would have done so immediately. There simply is no rationale for waiting so long to do so (WSOF 25).

Maxim has demonstrated that it preferred to handle its own defense by failing to even request a defense from Westfield, except as an afterthought, presumably only to create nuisance and delay which it can use to leverage some kind of settlement offer. Given numerous opportunities in this case to do so, Maxim has offered absolutely no excuse for this delay.

Maxim's conduct is consistent only with the proposition that it came to the same conclusion urged by Westfield above – the *Envirogen* claim is plainly not covered by the Westfield policy for several reasons. Maxim knows how to demand what it wants. It does not claim that its tender of defense was reasonably delayed for any reason. It simply chose not to tender the claim, and thus affirmatively waived any such right to coverage for the *Envirogen* claim.

## II. THERE IS NO PRESENT CASE OR CONTROVERSY WITH REGARD TO WESTFIELD'S DUTY TO DEFEND MAXIM IN THE *CRYSTAL LAKE* SUIT, OR THE *ENVIROGEN* SUIT SUBSEQUENT TO CRYSTAL LAKE'S CROSS-CLAIM, BECAUSE WESTFIELD FULLY PERFORMED ANY SUCH ALLEGED DUTY.

As argued above in Section I.B., mere economic loss is categorically held not to constitute "property damage" caused by an "occurrence," as those terms are used in a standard CGL policy like those at issue here. That is certainly true with regard to Crystal Lake's claims against Maxim (WSOF 14, 16, 18). Crystal Lake's disappointed commercial expectations through the failure of the Envirogen system supplied by Maxim constitute nothing but such economic loss, which is also (and redundantly) excluded by exclusions **b.**, **j.(5)&(6)**, **k.**, **l.**, **m.**, and **n.** (WSOF 80). See, e.g.: *Allied Prop. & Cas. Ins. Co. v. Metro N. Condo. Ass'n*, 850 F.3d 844, 846-48 (7th Cir. 2017)

(holding that similar exclusions precluded the duty to defend or indemnify on the basis "that CGL policies like Allied's do not cover the cost of repairing the insured's defectively completed work," including "liability for damages to other parts of the building besides the windows [*i.e.*, the insured's product] themselves…"); *Lagestee-Mulder, Inc. v. Consolidated Ins. Co*., 682 F.3d 1054, 1057 (7th Cir. 2012) (holding that the rule in Illinois is "settled" that "[w]here the underlying suit alleges damage to the construction project *itself* because of a construction defect, there is no coverage," instead, "there must be damage to something other than the structure, i.e., the building…" (emphasis in original)); *Travelers Ins. Co. v. Eljer Mfg., Inc*., 757 N.E.2d 481, 489 (Ill. 2001) (the purpose of a CGL policy is "to protect the insured from liability for injury or damage to the persons or property of others; they are not intended to pay the costs associated with repairing or replacing the insured's defective work and products, which are purely economic losses"); *Westfield Ins. Co. v. West Van Buren, LLC*, 59 N.E.3d 877, 884-86 (Ill.App. 2016) ("where the language of an insurance policy explicitly requires physical injury, it cannot be construed to provide coverage on the basis of loss or diminished use simply resulting from the failure of a component to perform as promised . . . . [o]therwise, the policy would function as a performance bond"); *CMK Development Corp. v. West Bend Mut. Ins. Co.*, 917 N.E.2d 1155, 1160-65 (Ill.App. 2009) (holding that in order to be covered as "property damage," the claim must allege damage to "something other than the project itself"); *Stoneridge Dev. Co., Inc. v. Essex Ins. Co.*, 888 N.E.2d 633, 648 (Ill.App. 2008) (no "property damage" occurred where underlying plaintiffs alleged only damage to their home).

Any damage to Maxim's own work lies categorically outside the scope of Westfield's CGL coverage. There has never been any dispute that Maxim was responsible for the entire water treatment project for Crystal Lake (WSOF 8, 9, 14). Maxim has never even argued that Westfield

has coverage for any damage to or loss of use of the water treatment system that it contracted to deliver to Crystal Lake.

Maxim did not file a counterclaim when it answered Westfield's complaint herein, but in its Motion for Summary Judgment, filed June 8, 2016, Maxim asserted for the first time that Westfield had a duty to defend Crystal Lake's claims (but not Envirogen's claims) based upon the little-used definition of "Property Damage" in sub-paragraph **b.**, which provides coverage for "[l]oss of use of tangible property that is not physically injured." (WSOF 80). Maxim argued that Westfield had a duty to defend because Crystal Lake's Cross-Claim against Maxim alleged that it had "caused the depletion of the City of Crystal Lake's natural resources from the other potable water wells 'as a result of the City's inability to use WTP #1 to its full and intended capacity,'" the "shortened life expectancy of the remaining components of the City's water treatment system due to overuse necessitated by the inability to use WTP#1," and "the 'complete loss' of WTP #1 building and the need to either significantly renovate or demolish the building as it is unusable in its current form due to the malfunction of the system." (WSOF 27-29; Dkt. 35-1 at 2-3).

Since such claims were outside the scope of Maxim's work (which consisted of installation of the Envirogen system within the WTP #1 building, to treat water from City well No. 7), it argued, "any damage allegedly caused by MAXIM and Envirogen's work to the other potable water wells or the WTP #1 building was damage that occurred to property other than what was part of MAXIM's own project." (Dkt. 35-1 at 7-8). This was Maxim's first articulation of its basis for a duty to defend Crystal Lake's claims.

Nine days later, Westfield agreed to defend Maxim, and to reimburse all of its post-tender defense fees and costs incurred in both underlying cases as a result of Crystal Lake's claims (including those spent defending Envirogen's claims thereafter) (WSOF 32). As set forth above

and in Westfield's Local Rule 56.1(b)(3) statement of facts, Westfield fully satisfied Maxim's demands in that regard as of September of 2016 (WSOF 42-56). Maxim did not make that process easy, since it lumped together all manner of legal bills which were not even arguably at issue, but agreement was eventually reached that the proper figure for Maxim's defense in the state court *Crystal Lake* case and the *Envirogen* case subsequent to Crystal Lake's Cross-Claim came to $56,789.15, which Westfield paid and Maxim accepted (WSOF 43, 47-56). No additional fees or costs have been asserted to date.

The *Crystal Lake* case was voluntarily dismissed, so there will be no duty to indemnify at issue in that case (WSOF 19). Westfield's full satisfaction of Maxim's defense claim, therefore, moots any possible dispute with regard to the *Crystal Lake* case filed in state court (WSOF 43, 47-56).

"Once the defendant offers to satisfy the plaintiff's entire demand, there is no dispute over which to litigate and a plaintiff who refuses to acknowledge this loses outright, under Fed. R. Civ. P. 12(b)(1), because he has no remaining stake." *Holstein v. City of Chicago*, 29 F.3d 1145, 1147 (7th Cir. 1994). Maxim frankly admits that "WESTFIELD has indeed paid all defense costs to LEF which represented MAXIM chiefly in the Crystal Lake state court case for time incurred since the filing of the City of Crystal Lake lawsuit on June 26, 2015." (Dkt. 64 at 4).[5] Thus, there is plainly no present case or controversy with respect to any duty to defend or indemnify Maxim for the *Crystal Lake* suit.

Likewise, it is undisputed that Westfield has paid Maxim in full for all fees and costs incurred in the *Envirogen* case subsequent to Crystal Lake's Cross-Claim, and agreed to do so just nine days after learning of the Cross-Claim (WSOF 32, 55). If Westfield indeed had a duty to

---

[5] Maxim's second set of defense attorneys at McDermott, Will and Emery did not appear in the *Crystal Lake* case, but only in the *Envirogen* case (WSOF 11; Dkt. 70 at pars. 11, 15, 27-28).

defend Maxim in the *Crystal Lake* case, or in the *Envirogen* case subsequent to the filing of Crystal Lake's Cross-Claim against it (which it disputes), it has mooted any such controversy over the duty to defend by promptly paying those fees and costs in full.

For all of the reasons stated above, the Court should enter summary judgment in favor of Westfield as to the duty to defend both the *Crystal Lake* case and the *Envirogen* case, under each pleading at issue in those two cases. The separate issue of Westfield's alleged duties to indemnify Maxim and to prosecute an appeal on Maxim's behalf in the *Envirogen* case will be addressed below.

## III.    THERE IS NO DUTY TO INDEMNIFY.

In contrast to the duty to defend, "an insurer's duty to indemnify arises only if the insured's activity and the resulting loss or damage *actually* fall within the CGL policy's coverage." *Allied Prop. & Cas. Ins. Co. v. Metro N. Condo. Ass'n*, 850 F.3d 844, 846-48 (7th Cir. 2017) (emphasis in original). If indeed Crystal Lake ever did seek to recover for any Property Damage for "loss of use" to property outside the scope of Maxim's work, it jettisoned those claims at some point prior to the filing of its Motion for Default Judgment (WSOF 64-66, 70-71, 73).

The list of categories of damages sought in that motion is noticeably absent any mention of any damage to or loss of use of any of the City's water wells besides No. 7, or to the building in which WTP #1 was housed, or to Crystal Lake's "natural resources" or to *any* other property outside the scope of Maxim's work (WSOF 64-66). Instead, all damages claimed in the motion arise as a result of operating, repairing and replacing the flawed Envirogen system (WSOF 64-66). Such damages constitute mere economic loss, which is categorically not covered under a CGL policy, as a matter of law.

The judgment entered in favor of Envirogen, moreover, is based solely upon Maxim's

refusal to pay for Envirogen's product, as well as derivative claims for attorney's fees and interest (WSOF 61-63, 78). As argued herein,[6] neither the damages awarded Crystal Lake nor the damages awarded Envirogen amount to "property damage" which is caused by an "occurrence," which is not otherwise excluded, but rather consist entirely of mere non-covered economic loss. Likewise, Maxim's breach of the late notice clause forecloses any duty to indemnify, as a matter of law. As such, the Court should grant summary judgment in favor of Westfield on the duty to indemnify.

## IV. THERE IS NO DUTY TO DEFEND THE *ENVIROGEN* APPEAL.

"It has been generally stated or recognized that an agreement in an insurance contract 'to defend' does not necessarily raise an obligation to prosecute an appeal." DUTY OF LIABILITY INSURER TO APPEAL, 69 A.L.R.2d 690 (originally published in 1960, updated continuously) (citing, *inter alia*, *Illinois Founders Ins. Co. v. Guidish*, 618 N.E.2d 436 (Ill.App. 1993); *Lincoln Park Arms Bldg. Corporation, for Use of Schroeder v. U.S. Fidelity & Guaranty Co.*, 5 N.E.2d 773 (Ill.App. 1936); and *General Cas. Co. of Wis. v. Whipple*, 328 F.2d 353 (7th Cir. 1964)). "If [an insurer] owe[s] no duty to defend [the insured] in the first instance, it clearly ha[s] no duty to appeal a judgment against him." *Guidish*, 618 N.E.2d at 441 (holding no duty to defend appeal where only count of underlying multi-count complaint being appealed was excluded). As argued above, because there is no duty to defend the *Envirogen* case, there is no duty to prosecute Maxim's appeal from the judgment entered therein.

Furthermore, the applicable rule with regard to the duty to defend is that "[a]n insurer's defense obligations cease when 'the claim against the insured is confined to a recovery that the policy does not cover.'" *Philadelphia Indem. Ins. Co. v. Chicago Title Ins. Co.*, 771 F.3d 391, 402

---

[6] Westfield here incorporates by reference the facts, arguments and authorities cited in Sections I.B., I.C., I.D. and IV.A. herein.

(7th Cir. 2014) (quoting, in part, *Solo Cup Co. v. Fed. Ins. Co.*, 619 F.2d 1178, 1185 (7th Cir. 1980).[7] So even if, *arguendo*, Westfield had a duty to defend any segment of the underlying *Envirogen* litigation, that duty necessarily ceased when the judgment was entered, because the judgment left no further doubt that only non-covered economic loss was at issue in the *Envirogen* lawsuit, as to either Envirogen or Crystal Lake (WSOF 61-63, 65-66, 70-71, 77, 78). The purported claims for "loss of use" to "other property" argued by Maxim in its motion for summary judgment here simply were not pursued to judgment in the underlying case (WSOF 61-63, 65-66, 70-71, 77, 78).

Finally, even assuming that a duty to defend an appeal otherwise exists, an insurer is only obligated "to prosecute an appeal in circumstances where reasonable grounds are present." *Guidish*, 618 N.E.2d at 441. An "absolute rule" to the contrary, "that an insurer is always obligated to prosecute an appeal," could, if "taken to the extreme… place an insurer in the untenable position of being obligated to pursue a totally groundless appeal simply to avoid a charge that it breached its duty to defend." *Id*.

As argued below, Westfield has no duty to pay for an appeal on Maxim's behalf for the first reason, at a minimum. Any attempt to resolve the second issue, in the event that becomes necessary, should plainly be stayed pending the outcome of the underlying appeal. *TIG Ins. Co. v. Canel*, 906 N.E.2d 621, 628 (Ill.App. 2009) (affirming order staying declaratory judgment action on issues which "would require factual determinations that go to the heart of the underlying [case],

---

[7] Accord: *Tews Funeral Home, Inc. v. Ohio Cas. Ins. Co.*, 832 F.2d 1037, 1042 (7th Cir. 1987); *Carboline Co. v. Home Indem. Co.*, 522 F.2d 363, 367 (7th Cir. 1975); *Sears, Roebuck & Co. v. Travelers Insurance Co.*, 261 F.2d 774, 777 (7th Cir. 1958); *In re McCook Metals, L.L.C.*, 07 C 0621, 2007 WL 1687262, *3 (N.D.Ill. June 7, 2007); *Sun Elec. Corp. v. St. Paul Fire & Marine Ins. Co.*, 94-C-5846, 1995 WL 270230, *3 (N.D.Ill. May 4, 1995); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Associates in Adolescent Psychiatry*, 86 C 4959, 1987 WL 12661, *2 (N.D.Ill. June 18, 1987); *Sears, Roebuck & Co. v. Employers Ins. of Wausau*, 585 F.Supp. 739, 745 (N.D.Ill. 1983); *Sears, Roebuck & Co. v. Zurich Ins. Co.*, 321 F.Supp. 1350, 1351 (N.D.Ill. 1971); *Sears, Roebuck and Co. v. Mutual Insurance Co.*, 199 F.Supp. 769, 770-72 (N.D.Ill.1961).

in contravention of the *Peppers* doctrine as outlined in *Maryland Casualty Co. v. Peppers*, 64 Ill.2d 187, 355 N.E.2d 24 (1976).").

A.     **The *Envirogen* Judgments Confirmed that the Only Claims at Issue were Always Purely Economic Loss, Not "Property Damage" Caused By An "Occurrence."**

Even assuming *arguendo* that there were ever any covered claims actually pled by either Envirogen or Crystal Lake, they were certainly not pursued to judgment.   As argued above, the list of categories of damages quoted in Crystal Lake's motion for prove-up above was noticeably absent any mention of any damage to or loss of use of any of the City's water wells besides No. 7, or to the building in which WTP #1 was housed, or any other property allegedly outside the scope of Maxim's work (WSOF 65-66, 71).   Instead, *all* damages claimed in the motion and awarded by the Court arose as a result of operating, repairing and replacing the flawed Envirogen system, which is certainly within Maxim's scope of work, which would constitute mere economic loss, not "property damage" caused by an "occurrence." *Westfield Ins. Co. v. West Van Buren, LLC*, 59 N.E.3d 877, 884-86 (Ill.App. 2016) (WSOF 61-63, 65-66, 70-71, 77, 78).

As the Seventh Circuit has stated the applicable standard, "if in the course of litigation the covered claims fall out of the case through settlement *or otherwise*, the insurer's duty to defend his insured ceases." *Lockwood Intern., B.V. v. Volm Bag Co., Inc.*, 273 F.3d 741, 744 (7th Cir. 2001) (Wisconsin law; emphasis added); *Sears, Roebuck and Co. v. Reliance Ins. Co.*, 654 F.2d 494, 496 (7th Cir.1981) (citing *Lee v. Aetna Cas. & Surety Co.*, 178 F.2d 750, 753 (2nd Cir. 1949)).   *Lee* elaborates on the point as follows:

> Whether the insurer ought to defend such an action [where some allegations are covered and others not] at least until it appears that the claim is not covered by the policy is not free from doubt; but it seems to us that we should resolve the doubt in favor of the insured. In most cases – the case at bar was one – it will not be difficult for the insurer to compel the injured party to disclose whether the injury is within the policy; and, *if it transpires that it is not, the insurer need go on no longer*.   There

19

> may be cases, however, in which that question will remain uncertain even until the end of the trial, and, if the defendant is right, the insured will be obliged to conduct the defence of a claim which it turns out the insurer has promised to pay.*** It follows that, if the plaintiff's complaint against the insured alleged facts which would have supported a recovery covered by the policy, it was the duty of the defendant to undertake the defence, *until it could confine the claim to a recovery that the policy did not cover*.

*Lee*, 178 F.2d at 752-53 (emphases added).

The Seventh Circuit most recently applied the rule that the confinement of the claim to a recovery that the policy does not cover terminates any duty to defend in *Philadelphia Indem. Ins. Co. v. Chicago Title Ins. Co.*, 771 F.3d 391, 402 (7th Cir. 2014). In that case, certain counterclaims triggered the insurer's duty to defend, but were then dismissed with prejudice. 771 F.3d at 396-97. The counterclaims were re-filed, but solely in order to preserve them for appellate review. *Id*. The Seventh Circuit held that this procedural step did not re-trigger the duty to defend, in that the dismissal "confined" the claim to non-covered allegations, reasoning as follows:

> A related loose end is whether Chicago Title owed Western Capital a continuing duty to defend against the potentially covered counterclaims that were refiled following their dismissal with prejudice. The answer is no. Refiling was allowed solely for the purpose of preserving the issues for appeal. An insurer's defense obligations cease when "the claim against the insured is *confined to a recovery that the policy does not cover*." *Solo Cup Co. v. Fed. Ins. Co.*, 619 F.2d 1178, 1185 (7th Cir.1980) (applying Illinois law). Chicago Title conceded at oral argument that its duty to defend the potentially covered claims in the underlying litigation would be triggered if those claims were to become live again. But because the dismissed counts *cannot result in a recovery* against Western Capital in the absence of a successful appeal reviving them, Chicago Title had *no continuing defense duty* to Western Capital.

*Philadelphia Indem. Ins. Co. v. Chicago Title Ins. Co.*, 771 F.3d 391, 402 (7th Cir. 2014) (emphasis added).[8]

---

[8] See also: *Sturges Mfg. Co. v. Utica Mut. Ins. Co.*, 37 N.Y.2d 69, 332 N.E.2d 319, 323 (1975) ("The insurer's duty to defend is, again, not an interminable one, and will end if and when it is shown unequivocally that the damages alleged would not be covered by the policy"); Shaun McParland Baldwin, "One Step Beyond Meadowbrook: Can an Insurer Direct Defense Counsel to Dismiss Covered Claims? An Examination of Insurance Defense Attorneys' Roles and Ethical Duties," 72 Def. Couns. J. 121 (2005) ("It

20

Courts from other jurisdictions have applied the rule that the duty to defend ceases once the claim is confined to non-covered causes of action in a variety of contexts, from involuntary dismissal of covered claims,[9] to voluntary dismissal,[10] to amendment of pleadings,[11] to summary judgment,[12] to narrowing of claims in a final pre-trial order,[13] and in the case of partial settlement.[14]

The present case presents an even more compelling reason to withdraw from the defense after the entry of judgment than a case like *Chicago Title*, because there is literally no chance that an appeal by Maxim could reinstate any of the "loss of use" claims that were voluntarily dropped by Crystal Lake in the prove-up on the default judgment against Maxim (WSOF 65-66, 70-71). For that reason, even assuming *arguendo* that Westfield ever had a duty to defend any of the claims

---

is a well-settled proposition that an insurer can withdraw from the defense if the potentially covered clams are dropped from the suit").

[9] *Wackenhut Services, Inc. v. National Union Fire Ins. Co. of Pittsburgh, PA*, 15 F.Supp.2d 1314, 1324 (S.D.Fla. 1998) (dismissal of covered claim terminated duty to defend as soon as covered claim was dismissed).

[10] *Baltimore Gas and Elec. Co. v. Commercial Union Ins. Co.*, 113 Md.App. 540, 688 A.2d 496, 510-11 (1997) (once plaintiff dismissed covered claim, insurer's duty to defend terminated, reasoning that "as a result of the changes in the plaintiffs' allegations, the Corradettis' claims against BGE were no longer within the ambit of the policy").

[11] *Eastern Shore Financial Resources, Ltd. v. Donegal Mut. Ins. Co.*, 84 Md.App. 609, 581 A.2d 452 (1990) (insurer had no further duty to defend after underlying plaintiff amended complaint to exclude covered counts).

[12] *Conway Chevrolet Buick, Inc. v. Travelers Indem. Co.*, 136 F.3d 210, 214 (1st Cir. 1998) (insurer properly terminated defense of insured after partial summary judgment on claims that had been covered).

[13] *Charter Oak Fire Ins. Co. v. Sumitomo Marine and Fire Ins. Co., Ltd.*, 750 F.2d 267, 272 (3rd Cir. 1984) (no duty to defend because plaintiff "filed its pre-trial narrative statement which clarified the issues for trial to the point where it was clear that the claim to be tried fell outside the coverage of the insurance policy").

[14] *Allstate Ins. Co. v. Mende*, 176 A.D.2d 907, 575 N.Y.S.2d 520, 522 (2d Dep't 1991) (insurer which settled only covered claim at issue and then withdrew from defense acted within its rights, explaining that although it "was initially obligated to provide a defense to the entire action, it was entitled, pursuant to the terms of the policy, to settle the claim for property damage"); *Meadowbrook, Inc. v. Tower Ins. Co., Inc.*, 559 N.W.2d 411, 417 (Minn. 1997) (holding that insurers did not "shirk their duties of defense by unilaterally settling only the arguably covered claims…'behind the back' of the insured"); *Reller, Inc. v. Hartford Ins. Co. of the Southeast*, 765 So.2d 87, 88 (Fla.App. 2000) ("Because Hartford obtained full satisfaction of the only covered claim (by paying it), it had the right to withdraw its defense"); *Seltzer v. Barnes*, 182 Cal.App.4th 953, 106 Cal.Rptr. 3d 290, 294-95 (1st Dist. 2010) (rejecting insured's claims that insurer acted improperly by settling only covered claims "in order to justify (a) denial of a defense on the remainder of the (complaint) and to provide (the party suing the insured) with funds to continue its litigation against (the insured)").

against Maxim, the Court should enter summary judgment in favor of Westfield holding that it has no duty to defend the appellate portion of the proceedings.

    **B.    Westfield Has No Duty to Procure or Pay for an Appeal Bond on Behalf of Maxim.**

The Supplementary Payments portion of the Westfield policy does not, unlike some other policies, provide for the procurement of an appeal bond (WSOF 80). *Wiegert-Stathes v. American Family Mut. Ins. Co.*, A-08-1041, 2009 WL 3381578, *5-7 (Neb.App. Oct. 20, 2009) (interpreting the same Supplementary Payments policy language as present here, holding that "the policy's silence about supersedeas bonds, standing by itself, does not create an ambiguity," and that a ruling to the contrary "would be imposing a burden on the insurer far greater than it contracted for and was paid premium for, and on the other hand, the insured would gain a benefit it did not contract for or pay premium for"). Maxim has never asserted to the contrary, either in its pleadings, or in any of its prior summary judgment filings, or in correspondence. (Dkt. 29; Dkt. 35; Dkt. 64; Dkt. 70; Dkt. 77; Dkt. 81; Dkt. 83).

Even in cases where policies do provide that an insurer will pay for the cost of an appeal bond, the insurer need not "furnish" such bonds. See, e.g.: *James River Ins. Co. v. Interlachen Propertyowners Ass'n*, CV 14-3434 ADM/LIB, 2016 WL 3093383, *4-6 (D.Minn. June 1, 2016), citing *Graf v. Hospitality Mutual Insurance Co.*, 956 F.Supp.2d 337, 343 (D.Mass. 2013) (policy language that required the insurer to pay "[t]he cost of appeal bonds," but not to "furnish appeal bonds" was held to require the insurer "to cover the premium and other incidental costs, not to indemnify the bond"); see also: 14 COUCH ON INSURANCE § 200:46 ("Most insurance policies carry a provision requiring the insurer to pay the premium on appeal bonds without obligating the insurer to actually furnish or obtain such a bond").

A ruling "requiring [an insurer] to post the supersedeas bond would extend [its] duty to

indemnify beyond the reaches of the Policy's coverage, since the posting of a supersedeas bond binds the appellant and its surety to pay the judgment if the appeal is unsuccessful." *James River* at \*6; see also: *United Fire & Cas. Co. v. Shelly Funeral Home, Inc.*, 642 N.W.2d 648, 658 (Iowa 2002) (holding it was not "bad faith" for the insurer to refuse to procure an appeal bond, even where the policy required it to pay for such bonds if procured by the insured, reasoning that "[g]iven the insurer's good-faith doubts about coverage, and the underlying purpose of the bond to secure the judgment, we agree it was reasonable for United Fire not to place itself in a position of assuming liability on the bond no matter the outcome of the appeal").

Maxim has not, to Westfield's knowledge, procured an appeal bond, so there is no issue of whether Westfield must reimburse Maxim for a cost which it has not incurred. In any event, there is simply no provision in the Westfield policies requiring the insurer to either procure such a bond or pay for any such bond procured by the insured.

Indeed, there is no need for such a policy provision, since if the judgment were covered, and if the appeal had merit, the insurer would need no further incentive to protect its own interests. Where, as here, the judgment is plainly not covered, a provision requiring the insurer to procure such a bond would provide a windfall to the policyholder. In any event, the parties saw no need to include such a provision in the policy, and there is no other basis for imposing such a duty on Westfield.

## V. EVEN IF WESTFIELD HAD A DUTY TO DEFEND ONE OR MORE OF THE UNDERLYING CLAIMS, IT WOULD OWE NO DAMAGES FOR MAXIM'S DEFAULT JUDGMENTS.

In its Counterclaim, Maxim alleges that Westfield is liable for the damages it suffered as a result of the default judgments entered against it in the *Envirogen* case, based on breach of contract for failure to defend (Dkt. 70 at 1-11). Maxim never directly asserts that any of the damages awarded against it are actually covered under the Westfield policies, but only that Westfield caused

23

these judgments to be entered by failing to defend it.  As argued above, Westfield has fully performed any duty which it even arguably had to defend to Maxim, if any.  Even if the Court were to conclude otherwise, however, Westfield cannot be held liable for Maxim's default judgments, as a matter of law.

When a defendant breaches a contract, the plaintiff is entitled to be placed in the same position he would have been in had the contract been performed, but the compensation should not provide the plaintiff with a windfall. *Walker v. Ridgeview Construction Co.*, 736 N.E.2d 1184, 1187 (Ill.App. 2000).  In determining whether damages are compensable under the law of contracts, Illinois follows the rule in *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng. Rep. 145 (1854), that "recoverable damages are those which naturally result from the breach, or are the consequence of special or unusual circumstances which are in the reasonable contemplation of the parties when making the contract." *Doe v. Roe*, 681 N.E.2d 640, 650 (Ill.App. 1997).  In other words, a "person breaching a contract can [only] be held liable for such damages as may fairly and reasonably be considered as naturally arising from the breach thereof in light of the facts known or which should have been known or such as may reasonably be supposed to have been within the contemplation of the parties as a probable result of a breach thereof." *Case Prestressing Corp. v. Chicago Coll. of Osteopathic Med.*, 455 N.E.2d 811, 816 (Ill.App. 1983).  Thus, proximate cause is a "principle applicable alike to breaches of contract and to torts." *Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734, 746 (Ill. 1994).  While proximate cause is generally a question of fact, where, as here, the undisputed facts demonstrate that the pleader would never be entitled to recover, it becomes a question of law. *TIG Ins. Co. v. Giffin Winning Cohen & Bodewes, P.C.*, 444 F.3d 587, 591-92 (7th Cir. 2006).

As argued below, Westfield's decisions regarding the duty to defend could never be the

proximate cause of Maxim's default, because the responsibility to assure that the case was properly defended was Maxim's alone. Any duty on the part of Westfield would have been limited to reimbursing Maxim for the any fees and costs which this Court ultimately rules that it has a duty to pay.

### A. Westfield Properly and Promptly Suspended Any Duty to Defend it May Otherwise Have Had by Seeking a Declaratory Judgment.

Maxim asserts that Westfield's agreement to defend after Crystal Lake filed its Cross-Claim in the *Envirogen* case operates as a concession that it must pay *all* of its defense fees, regardless of when they were incurred, and further that it should have agreed to pay all of these fees earlier, and that this caused the default judgments to be entered against it (Dkt. 64; Dkt. 70; Dkt. 81). But no such argument based on payment of fees could succeed, because Westfield filed the present declaratory judgment action on October 22, 2015, immediately suspending any duty to pay defense fees until the resolution of this action (Dkt. 1).

The established rule in Illinois is that when an insurer believes that its policy does not cover a claim, it may either: (1) defend the suit under a reservation of rights, or (2) seek a declaratory judgment that no coverage exists. *Employers Ins. of Wausau v. EHLCO Liquidating Trust*, 708 N.E.2d 1122, 1134-35 (Ill. 1999). An insurer need not do both — "these are separate and distinct options." *State Farm Fire & Cas. Co. v. Martin*, 710 N.E.2d 1228, 1231 (Ill. 1999).

It is well-established under Illinois law that "an insurer's duty to defend is *suspended* upon its filing for a declaratory judgment that there is no coverage." *Those Certain Underwriters at Lloyd's v. Prof'l Underwriters Agency, Inc.*, 848 N.E.2d 597, 601 (Ill.App. 2006) (emphasis added). In other words, "[a]n insurer…has the option of filing a declaratory judgment action and *waiting to act until after its policy obligations are determined*, at which time the insurer may be liable to reimburse the insured for any costs of defense the insurer should have paid." *Universal*

*Underwriters Ins. Co. v. LKQ Smart Parts, Inc.*, 963 N.E.2d 930, 948 (Ill.App. 2011) (emphasis added). "[A]n insurer alleging a policy defense against its insured…is under no obligation to act on its alleged duty to defend until *after* the declaratory judgment action." *Certain Underwriters*, 848 N.E.2d at 604 (emphasis added).

The Illinois Supreme Court in *Martin* pointed out that to hold otherwise would render the declaratory judgment option illusory, because it "would effectively require insurance companies to defend their purported insured in *all* cases, even where the underlying complaints are clearly outside the scope of the policy." 710 N.E.2d at 1231 (emphasis in original). The *Martin* Court agreed with the insurer in that case that "such a holding would represent an unprecedented and unwarranted expansion of an insurer's duty to defend." *Id.* Such a rule would force insurers to deny coverage immediately rather than to defend initially while investigating the claim, trying to reach an early settlement, or considering a complex coverage or conflict issue. To hold that an insurer will be punished if it exercises this option is indefensible. *Waste Management, Inc. v. Int'l Surplus Lines Ins. Co.*, 579 N.E.2d 322, 334 (Ill. 1991) (explaining that "[w]hile an insurer's statements disclaiming coverage may be couched in terms of denial, such a denial, when alleged in the pleadings or which precedes a promptly filed complaint for declaratory action, is not tantamount to repudiation of the policy obligations," and that "[a] contrary conclusion would negate the protections for which the declaratory judgment action is designed and ultimately penalize insurers for conduct which we have previously sanctioned as proper").

Illinois courts have consistently held that insurers in Westfield's position are perfectly entitled to exercise either or both of the two approved options outlined in *Martin* in the face of a questionable claim, and may do so simultaneously or sequentially, so long as one or both options are exercised promptly, as was the case here. See, e.g.: *IMC Global v. Continental Ins. Co.*, 883

26

N.E.2d 68, 80-81 (Ill.App. 2007) (insurer satisfied obligations by agreeing to defend under reservation of rights by reimbursing insured for costs of independent counsel within three months of tender of defense, paying two months of invoices, then shortly thereafter denying coverage, terminating defense payments, and filing a declaratory judgment action); *Illinois Ins. Guar. Fund v. Santucci*, 894 N.E.2d 801, 808 (Ill.App. 2008) (insurer's defense of insured for a year prior to filing declaratory judgment action was not a waiver of its position that he did not qualify as an "insured").

So long as the insurer utilizes any combination of the two "separate and distinct" options approved by the Illinois Supreme Court, it satisfies its obligations under Illinois law and neither waives nor is estopped from contesting the duties to defend or indemnify. If it were the case that a decision to defend at least a part of the proceedings in the interim *itself* constituted an acknowledgement of a possibility of coverage, thus independently establishing a duty to defend, then the "two" options provided an insurer by the Illinois Supreme Court would effectively become only one option – absolutely refuse to defend at the outset or else be deemed to concede that there is a duty to defend.

Judge Dow recently tackled exactly the argument made by Maxim in this case in *Hartford Cas. Ins. Co. v. ContextMedia, Inc.*, 65 F.Supp.3d 570 (N.D.Ill. 2014), and concluded that "in *Those Certain Underwriters at Lloyd's v. Professional Underwriters*, another Illinois court made clear that an insurer that files a declaratory judgment 'before or pending trial of the underlying action…is under no obligation to act on its alleged duty to defend until after the declaratory judgment action,' [and] 'has the option of filing a declaratory judgment action and waiting to act until after its policy obligations are determined...'" 65 F.Supp.3d at 587-88. The argument to the contrary, held Judge Dow, "has no basis in Illinois law." 65 F.Supp.3d at 588.

In addition to the *ContextMedia* case, several federal courts predicting Illinois law on this issue have held that an insurer creates no new duties simply by undertaking to defend under a reservation of rights while simultaneously seeking a declaratory judgment that it has no such duty, even if it does not defend completely. See: *Scottsdale Ins. Co. v. Walsh Const. Co*., 10 C 1565, 2011 WL 4538456, *7 (N.D.Ill. Sept. 29, 2011) (insurer defended under a reservation of rights for ten months, then properly withdrew from the defense 19 months prior to resolution of declaratory judgment action); *Taco Bell Corp. v. Cont'l Cas. Co*., 01 C 0438, 2003 WL 1475035, *4 (N.D.Ill. Mar. 17, 2003), *affirmed in relevant part*, 388 F.3d 1069 (7th Cir. 2004) (insurer defended under a reservation of rights for 13 months, then properly withdrew from the defense prior to seeking a declaratory judgment); *TIG Ins. Co. v. Joe Rizza Lincoln-Mercury, Inc*., 00 C 5182, 2002 WL 406982, *8 (N.D.Ill. Mar. 14, 2002) (insurer defended under reservation of rights for 14 months, then properly withdrew defense and filed declaratory judgment action 19 months prior to a declaration that it did not owe a defense).

Correctly framed, the issue here is whether an insurer which promptly denies coverage and files a declaratory judgment action, then voluntarily undertakes to pay some but not all of the defense fees at issue, thereby creates a non-contractual duty merely by virtue of the voluntary undertaking. There are several prior Illinois decisions which explain why that could not be the case.

Where a defendant voluntarily undertakes to provide a service to the plaintiff, "the duty of care to be imposed upon a defendant is limited to the extent of the undertaking." *Bell v. Hutsell*, 955 N.E.2d 1099, 1104 (Ill. 2011). Courts "narrowly construe" the voluntary undertaking theory. *Fichtel v. Board of Directors of River Shore of Naperville Condominium Ass'n*, 907 N.E.2d 903, 911 (Ill.App. 2009). It is well-established in the insurance context in Illinois that an insurer's

voluntary provision of benefits does not create any extra-contractual duty. See, e.g.: *Martin v. State Farm Mut. Auto. Ins. Co.*, 808 N.E.2d 47, 54 (Ill.App. 2004)("[i]n stating a claim for breach of contract, only a duty imposed by the terms of the contract can give rise to the breach"); *U.S. Fire Ins. Co. v. Zurich Ins. Co.,* 768 N.E.2d 288, 301 (Ill.App. 2002) (rejecting theory of "breach of common law duties voluntarily assumed" against primary insurer); *Furtak v. Moffett*, 671 N.E.2d 827, 830 (Ill.App. 1996) ("The fact that defendants instituted procedures to determine whether their insureds were underinsured and Farmers encouraged their agents to inform their insureds that they should evaluate the adequacy of their coverage does not impose upon them a duty to warn plaintiffs of their inadequate insurance"); *Cope v. State Farm Fire & Cas. Co.*, 760 N.E.2d 1020, 1024 (Ill.App. 2001) (holding that in the absence of any "statutory or common-law duty," an insurer incurred no new duty under the "voluntary undertaking" theory, reasoning that "[i]n the absence of a showing that there was a legal duty, we decline to impose such a responsibility" on the insurer); *Fichtel v. Board of Directors of River Shore of Naperville Condominium Ass'n*, 907 N.E.2d 903, 905 (Ill.App. 2009) (no duty created on the part of insurance inspector upon discovering mold in insured's attic and stating that he "would take care of it").

Courts in other jurisdictions have explicitly applied this same reasoning in rejecting the proposition that the provision of a partial defense in the context of a coverage dispute creates a new, extra-contractual duty on the part of the insurer. See: *Conway Chevrolet Buick, Inc. v. Travelers Indem. Co.*, 136 F.3d 210, 214 (1st Cir. 1998) ("If the complaint unambiguously excludes coverage…an insurer's decision to undertake a defense temporarily cannot force it to remain involved until it is able to secure judicial permission, or other formal authority, to withdraw"); *Moon v. Cincinnati Ins. Co*., 975 F.Supp.2d 1326, 1328 (N.D.Ga. 2013), *affirmed*, 592 Fed.Appx. 757 (11th Cir. 2014), *later proceeding*, 2015 WL 342330 (11th Cir. Jan. 27, 2015) (holding that

29

where insurer "initially provided a defense" pursuant to bilateral non-waiver agreements, then "denied coverage and withdrew its defense," it owed no further duties because there was no duty to defend under the terms of the policy, concluding that that "[b]ecause Cincinnati effectively reserved its rights before providing an initial defense to the Plaintiffs, the Court concludes that Cincinnati is not estopped from denying coverage to Shawn and Tanya Moon," rejecting the argument that the insurer voluntarily undertook a duty and "only provided the courtesy defense to further its own ends").

Furthermore, even assuming that Westfield had a duty to defend one or more of the underlying claims, Westfield was under no duty to pay Maxim's attorneys' fees based merely upon Maxim's demands. Instead, Westfield has a right to review and contest the charges incurred by Maxim's independent counsel, once it was presented with them. *Santa's Best Craft, L.L.C. v. Zurich American Ins. Co.*, 941 N.E.2d 291, 297 (Ill.App. 2010) (holding it is not the case "that the defense expenses submitted on behalf of an insured's independent legal counsel are *per se* reasonable," affirming ruling that the insured "overbilled [the insurer] by nearly $465,000," on the basis that these fees were incurred in other litigation).

In this case, for example, Maxim insisted that the bills attributable to Westfield's offer to defend amounted to $321,395.93 (WSOF 42). After consultation between the attorneys for Westfield and Maxim, it was determined that the vast majority of these fees and costs were in connection with other claims, and the real amount at issue was $56,789.15, just 18% of Maxim's original claim, which Westfield promptly paid in full (WSOF 43, 47-48, 51-56). Westfield had every right to challenge Maxim's initial demands.

In short, Westfield was under no obligation to advance any fees and costs to Maxim *at all* prior to its attorneys' withdrawal and the entry of the default judgments, and so its refusal to do so

30

earlier or in greater amounts could never be the legal or proximate cause of Maxim's default judgments. On that basis alone, the Court should grant summary judgment in Westfield's favor.

**B.    Maxim Was the Sole Cause of its Own Default Judgment, and Could Have Easily Avoided That Unforeseeable Result By Communicating With Westfield in a Timely Manner.**

In this case, the default judgments entered against Maxim were solely caused by its own negligence in (1) failing to give advance notice of the fact that it had refused to pay its attorneys for two years, nor (2) that they had repeatedly threatened to withdraw, nor (3) that they had in fact withdrawn with leave of court, nor (4) that it was no longer attending mandatory status conferences in the underlying case, and (5) by failing to timely accept Westfield's offer to appoint a defense attorney to represent it in the *Envirogen* case.

The relevant facts are undisputed. As set forth more fully in Westfield's Local Rule 56.1(b)(3) statement of material facts in support hereof, Westfield was notified of the only claim that Maxim argues is potentially covered (the Crystal Lake Cross-Claim in *Envirogen*) on June 8, 2016 (WSOF 27-28, 30-31). On June 17, 2016, Westfield agreed to defend Maxim in the *Envirogen* case (WSOF 32). At that time, unbeknownst to Westfield, Maxim's defense counsel had already withdrawn and Maxim had allowed one status conference to proceed before Judge Zagel in its absence, with no explanation or attempt to communicate with the Court (WSOF 34, 38, 58). The second such missed status conference, on June 23, 2016, was – in Judge Zagel's view – the straw that broke the camel's back, and the default judgments at issue here were the inevitable consequence (WSOF 60-69).

So Westfield's offer to defend hung in the air for six days while Maxim's chances of avoiding a default slipped away. Maxim has never provided any explanation for why it allowed the second status conference to proceed in its absence without even responding to Westfield's

offer. It is indisputable that had Maxim accepted Westfield's offer to defend when it was made on June 17, 2016, the default clearly could have been avoided (WSOF 32).

On July 6, 2016, Westfield learned for the first time that Maxim's attorneys had filed motions to withdraw in the underlying case on May 4, 2016 and May 6, 2016, respectively, and had been granted leave to withdraw on May 9, 2016 (WSOF 34). The July 6, 2016 letter also disclosed to Westfield for the first time that Maxim failed to attend the two consecutive status hearings since its attorneys withdrew (WSOF 38).

As for why it did not hire a lawyer to defend it at the June 23, 2016 status conference, Maxim stated in the underlying case that "[t]hroughout June and/or July 2016, Maxim sought to retain the law firm of Esp Kreuzer Cores, LLP," and that "[t]here were ongoing discussions regarding Esp Kreuzer Cores, LLP's representation of Maxim in this case; ultimately, however, a conflict of interest prevented the law firm from assuming Maxim's defense," and that "[d]espite Maxim's eagerness and optimism that it would be able to retain Esp Kreuzer Cores, LLP to assume Maxim's defense, a determination was made that an actual conflict of interest precluded the law firm from representing Maxim in this case." (WSOF 67).

Maxim's failure to pay its defense counsel had nothing to do with Westfield, because Maxim quit paying them long before it even gave Westfield first notice of the case (WSOF 34-37). Maxim also never "sought to retain the law firm of Esp Kreuzer Cores, LLP" (Westfield's panel defense counsel), contrary to the representation made to the District Court in the underlying case (WSOF 39). As Maxim's counsel frankly conceded in his letter of July 6, 2016, Maxim unilaterally *rejected* the June 17, 2016 offer by Westfield to appoint the Esp Kreuzer firm to defend the case (WSOF 39). There were no "ongoing discussions" regarding this subject which could conceivably justify Maxim's delay in retaining counsel. Maxim simply dropped the ball.

32

Maxim made a deliberate choice not to have an attorney appear in court in the underlying case (WSOF 38, 60, 69, 75). Even under the distorted view of the facts offered to the District Court in the underlying case, Maxim simply failed to look after its own affairs and has no one but itself to blame for the default. As Judge Zagel put it, "[a]lthough Maxim has recently reappeared in this case with counsel, they did not show good cause for their failure to appear at two status hearings or for their failure to notify the court – either prior to the status hearings or in briefing this motion – of any efforts they made to acquire new counsel." (WSOF 60).

Judge Zagel concluded that there was no excuse for Maxim's failure to "contact the Court or its opponent to inform them of the situation or request a continuance…" (WSOF 69). That opinion noted that "[a]t some undisclosed time after Maxim effectively disappeared from the case, Westfield agreed to provide Maxim with a defense…" (WSOF 69). Presumably, Maxim did not disclose to Judge Zagel the timing of Westfield's offer to appoint defense counsel, because that came six days *before* it missed the key second status conference on June 23, 2016 (WSOF 32). The excuse that Maxim offered to Judge Zagel was no excuse at all.

Judge St. Eve later echoed the conclusion that Maxim had only itself to blame for failing to show up for court. As Judge St. Eve pointed out, Maxim's excuses for failing to participate in the litigation because of "lack of funds" and its supposed "attempts to obtain replacement counsel," were meritless on their face (WSOF 74-76). Maxim *did* have counsel during the period that it failed to attend the status conferences in the underlying case, notably, Maxim's counsel in this declaratory judgment action (WSOF 75-76). As Judge St. Eve pointed out, regardless of any difficulties in retaining defense counsel, Maxim could have "hired counsel for the limited purpose of contacting the court," and indeed it could have simply "asked its counsel that was litigating a declaratory judgment action filed by its insurer to contact the court." (WSOF 76). As Judge St.

Eve also pointed out, the fact "that Maxim chose to pay for counsel in a separate lawsuit rather than this one does not excuse its nonappearance and lack of communication with the court." (WSOF 76).

What Judge Zagel and Judge St. Eve were *not* told by Maxim was that it was affirmatively offered defense counsel by Westfield nearly a week *before* the fateful second missed status conference on June 23, 2016, and unilaterally refused the offer (WSOF 32, 39). In light of that undisputed fact, it must take full responsibility for the default judgments which were entered against it.

Furthermore, it could not have been foreseeable to Westfield that Maxim's two law firms defending it in the underlying case would withdraw for non-payment of fees, because Westfield was never informed that Maxim was not paying these lawyers, or that they had threatened to withdraw, or had in fact withdrawn with leave of court (WSOF 34). Even setting that fundamental, undisputed fact aside, it is completely unforeseeable that Maxim would not have taken some protective measure, such as having its attorneys in this case contact Judge Zagel's chambers to request some additional time to secure new representation. Maxim's behavior was cavalier at best, and closer to irrational. Maxim's refusal to participate in the underlying *Envirogen* case at all following the withdrawal of its defense attorneys was completely unforeseeable from Westfield's perspective.

## C. Maxim's Own Claim of a Conflict of Interest Defeats Any Claim for Damages Caused by the Default Judgments.

Instead of taking Westfield up on its offer to defend, Maxim insisted that Westfield pay for Maxim's independent counsel of choice, based upon a purported conflict of interest created by Westfield's reservation of rights (WSOF 39). Under this theory, Westfield could not even in theory have been the cause of the default judgments.

In the case of a conflict of interest there is "an exception to the general rule" regarding the duty to defend. *Murphy v. Urso*, 430 N.E.2d 1079, 1082 (Ill. 1981). In such a situation, "[i]nstead of participating in the defense itself, the insurer must pay the costs of independent counsel for the insured." *Id.* "Paying costs is all the insurer may do in such a situation." *Littlefield v. McGuffey*, 979 F.2d 101, 105 n. 3 (7th Cir. 1992). As argued above, an insurer charged with reimbursing the insured for the fees and costs of its own independent counsel, such as in a conflict situation, is entitled to review and contest the legal bills, once presented with them. *Santa's Best Craft, L.L.C. v. Zurich American Ins. Co.*, 941 N.E.2d 291, 297 (Ill.App. 2010).

Maxim has consistently argued and pled that a conflict of interest exists and has never disputed that Westfield is entitled to the protection afforded an insurer in such a situation by the rule enunciated in *Murphy*. (WSOF 39; Dkt. 70 at par. 34, 39, 40, 42, 78, 79; Dkt. 81 at 9). Under that rule, actually hiring independent counsel and making sure that he attends status conferences is *solely* Maxim's responsibility.

For Westfield to be asked to bear the consequences of Maxim's failure to defend the *Envirogen* case would be all the more unjust here. For reasons known only to itself, Maxim chose not to inform Westfield that it had not paid its attorneys at all for two years, from the inception of the litigation, nor that they had (understandably) threatened to withdraw, nor that they had *in fact* withdrawn with leave of court, nor that Maxim had already ignored one status conference and apparently planned to ignore the rest of the case altogether (WSOF 34-38). During this entire period, it vigorously litigated *this* case through separate counsel (Dkt. 24, Dkt. 29, Dkt. 35, Dkt. 40).

Fortuitously, Westfield offered to defend Maxim and to even arrange for a new attorney to step in on its behalf (WSOF 32). Maxim inexplicably ignored this offer until it was too late, and

then rejected it (WSOF 32-33, 39). Certainly, if Westfield had been notified that Maxim's defense was on life support, with six precious days to go before the plug was pulled, it could have instructed defense counsel to meet with Maxim immediately and get an appearance on file that day, and sort out the conflict issues later.

Conflict of interest debates are common, as this area of the law is notoriously complex. The only real guidance on the issue of whether a conflict of interest arose in this context is *Stoneridge Dev. Co. v. Essex Ins. Co.*, 888 N.E.2d 633 (Ill.App. 2008), another construction defect case which turned on the issue of whether there was covered "property damage" at issue, based on whether the insured damaged the construction project itself, or "other" property. The *Stoneridge* case clearly held that there is no conflict of interest requiring independent counsel in a situation like this one. 888 N.E.2d at 644-49. There is no contrary authority in Illinois which Westfield has been able to locate. Maxim has offered no such authority on this topic. Maxim's position was unreasonable, yet Westfield bent over backward to accommodate its demands. Maxim cannot now reverse course and claim that Westfield had a duty to directly appoint defense counsel on its behalf.

### D. Westfield's Actions were Timely.

Despite the weakness of Maxim's assertion of a conflict of interest, Westfield acceded to Maxim's demand for independent conflict counsel just seven weeks after Maxim asserted it (WSOF 45). In this regard, Westfield certainly acted promptly, as it did in agreeing to defend Maxim just nine days after the disclosure of Crystal Lake's Cross-Claim in the *Envirogen* case, as well as in filing the present action just two months after the initial tender of defense (WSOF 25-26, 32). It is "implicit in ascertaining 'reasonable promptness' that all the time between" the triggering event and an insurer's response "cannot be considered as 'delay,' because within that period some part of the time – reasonable in relation to the status of the pending litigation – must

36

be allowed to the insurer to evaluate its position and to determine what route it will follow." *American States Ins. Co. v. National Cycle, Inc.*, 631 N.E.2d 1292, 1297 (Ill.App. 1994).  A delay of 15 months from the date of tender to the filing of the declaratory judgment action has been found reasonable where the insured was difficult and evasive, as in this case. *Employers Reinsurance Corp. v. E. Miller Insurance Agency*, 773 N.E.2d 707, 718-20 (Ill.App. 2002) (reversing summary judgment in favor of insured); *State Auto. Mut. Ins. Co. v. Kingsport Development, LLC*, 846 N.E.2d 974, 988 (Ill.App. 2006) (citing *E. Miller* for the proposition that a "15–month delay in filing declaratory judgment action [is] not unreasonable").  There is no hard-and-fast rule regarding when the declaratory judgment action must be filed, because circumstances vary widely.  Several Illinois cases, however, have held that a delay of up to seven months is reasonable as a matter of law. *Kingsport Development*, 846 N.E.2d  at 988 (seven months); *L.A. Connection v. Penn-America Insurance Co.*, 843 N.E.2d 427, 433 (Ill.App. 2006) (seven months); *Westchester Fire Ins. Co. v. G. Heileman Brewing Co., Inc.*, 747 N.E.2d 955, 965 (Ill.App. 2001) (six months); *Sears, Roebuck and Co. v. Seneca Ins. Co.*, 627 N.E.2d 173, 178 (Ill.App. 1993) (seven months).  In this case, Westfield filed the present declaratory judgment action just two months after being notified of Maxim's claim, which is reasonable by any measure (WSOF 25-26).  *L.A. Connection*, 843 N.E.2d at 433 ("Plaintiff has not cited, and our research has not revealed, any case holding that an insurer breached the duty to defend where a declaratory judgment action was commenced within four months").

This case is also much like *Certain Underwriters at Lloyd's, London v. Central Mut. Ins. Co.*, 12 N.E.3d 762, 770 (Ill.App. 2014), where the insurer at issue was not just "sitting on the sidelines and doing nothing," but rather "attempted to investigate the coverage question, but [the insured's] attorney did not respond" for months, thus adding to the supposed delay. See also: *Home*

37

*Ins. Co. v. U.S. Fidelity and Guar. Co.*, 755 N.E.2d 122, 134 (Ill.App. 2001) (holding that although defendant insurer had a duty to defend as a matter of law, imposition of estoppel as a matter of law was not appropriate, remanding for determination of when the insurer gained actual knowledge that "the complaint fell within or potentially within coverage of the policy").

Maxim simply cannot blame Westfield for the imposition of the default judgments against it, based on the undisputed facts. Maxim created its own problem long before it even gave notice to Westfield of the underlying suits (WSOF 34-38). It dithered when Westfield did offer to defend, and then took unreasonable legal positions, unnecessarily prejudicing its own defense in the underlying case (WSOF 32-33, 39). Its assertion of a conflict of interest, dubious though it may be, alone relieves Westfield of any responsibility to assure that Maxim's independent defense counsel attend court (WSOF 33, 39). Finally, though Maxim has made it nearly impossible to keep up with its evolving and unfounded legal positions, Westfield has timely and more than properly responded in the manner mandated by Illinois law (WSOF 25-26, 32, 45). For all of those reasons, Westfield could not be the legal or proximate cause of Maxim's default judgments, and the Court should grant summary judgment in its favor accordingly.

## IV. WESTFIELD IS ENTITLED TO SUMMARY JUDGMENT ON MAXIM'S SECTION 155 CLAIM.

It is well-established that in the absence of any actual coverage, or even if the Court finds that there is coverage, it should decline to enter an award for damages under 215 ILCS §5/155 if the insurer's position represented a *bona fide* dispute. *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 200 F.3d 1102, 1110 (7th Cir. 2000) (an insurer's conduct is not vexatious and unreasonable in violation of Section 155 if "(1) there is a *bona fide* dispute concerning the scope and application of insurance coverage; (2) the insurer asserts a legitimate policy defense; (3) the claim presents a genuine legal or factual issue regarding coverage; or (4) the insurer takes a

reasonable legal position on an unsettled issue of law"). "Attorneys fees may not be awarded [under Section 155] simply because the insurer takes an unsuccessful position in litigation, but only where the evidence shows that the insurer's behavior was willful and without reasonable cause." *Id.*

In this case, Westfield's legal position is in compliance with Illinois law. The prospect that Maxim should be covered for its shoddy workmanship in selecting and installing the Envirogen system for Crystal Lake has been rejected many times by the Illinois Courts and the Seventh Circuit, as argued above. The prospect that it should be covered for its refusal to pay the purchase price for the Envirogen system, moreover, turns the concept of liability insurance for "property damage" caused by "accidents" on its head.

Maxim's argument that "other" property was damaged as a result of its work for Crystal Lake was weak, as illustrated by the fact that Crystal Lake did not even seek to prove up any such damages in the enforcement of its default judgment (WSOF 65-66, 70-71). "As a general rule, a default judgment establishes, as a matter of law, that defendants are liable to plaintiff as to each cause of action alleged in the complaint." *O'Brien v. R.J. O'Brien & Associates, Inc.*, 998 F.2d 1394, 1404 (7th Cir. 1993). The fact that Crystal Lake chose not to pursue any damages for "other" property, outside the scope of Maxim's work, reveals that these allegations were simply background facts, not actual "claims," and so they would not be considered in determining the duty to defend, because "factual allegations are *only* important insofar as they point to a theory of recovery." *Allied Prop. & Cas. Ins. Co. v. Metro N. Condo. Ass'n*, 850 F.3d 844, 848 (7th Cir. 2017) (emphasis added); *Health Care Industry Liability Ins. Program v. Momence Meadows Nursing Center, Inc.*, 566 F.3d 689, 696 (7th Cir. 2009); *Medmarc Cas. Ins. Co. v. Avent America, Inc.*, 612 F.3d 607, 614-17 (7th Cir. 2010).

Nevertheless, Westfield accepted Maxim's thinly-supported tender of defense in the *Envirogen* case just *nine days* after Maxim disclosed the only pleading that it claims triggers the duty to defend (WSOF 32). With a declaratory judgment action already on file, Westfield had every right to refuse to defend outright unless and until the Court ruled against it, but it took the high road and offered to defend immediately, regardless.

Westfield promptly set forth its position regarding the alleged conflict in good faith, and in any event agreed to pay for independent counsel soon thereafter (WSOF 45). It is common for insurers in the event of a dispute over a conflict of interests to appoint defense counsel as a courtesy while the dispute is resolved. See, e.g.: *Maryland Cas. Co. v. Peppers*, 355 N.E.2d 24, 29 (Ill. 1976) (insured not prejudiced where insurer appointed panel counsel, then allowed independent counsel to substitute later); *Central Mut. Ins. Co. v. Tracy's Treasures, Inc*., 19 N.E.3d 1100, 1105 (Ill.App. 2014) (provision of courtesy defense by insurer appropriate).

No harm at all would have come to Maxim by accepting Westfield's panel counsel's representation at the status conference scheduled for June 23, 2016, if only to explain the situation to Judge Zagel and request more time to sort out who was going to represent Maxim, as Judge St. Eve suggested in the December 13, 2016 Order in the underlying case (WSOF 74-76). The proposition that Maxim was better off with no attorney at that status conference *at all*, because of some imagined prejudice which would ensue, is absurd. It was Maxim which behaved vexatiously and unreasonably throughout this case, not Westfield. The Court should enter summary judgment in favor of Westfield on all of Maxim's claims.

WHEREFORE, the Plaintiff/Counterdefendant, Westfield Insurance Company, prays that this Honorable Court enter an Order granting it Summary Judgment on all claims, pursuant to Rule 56 of the Federal Rules of Civil Procedure, and for such other and further relief as this Court deems

fair and just under the circumstances.

Respectfully submitted,
LINDSAY, PICKETT, RAPPAPORT &
POSTEL, LLC


By: /s/ David S. Osborne

David. S. Osborne
Lauren E. Rafferty
LINDSAY, PICKETT, RAPPAPORT & POSTEL,
LLC
10 S. LaSalle St., Suite 1301
Chicago, Illinois 60603
Tel: (312) 800-6025
Fax: (312) 629-1404
dosborne@lprp-law.com
lrafferty@lprp-law.com
*Attorneys for Plaintiff/Counterdefendant*
*Westfield Insurance Company*

41

**CERTIFICATE OF SERVICE**

I, ***David S. Osborne***, certify that on **May 5, 2017**, I electronically filed ***Westfield's Memorandum of Law in Support of its Motion for Summary Judgment*** with the Clerk of the Court using the CM/ECF system, which will send notification to all counsel of record.

/s/ David S. Osborne