**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **WESTFIELD INSURANCE COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 15 C 9358** |
| | ) | |
| **MAXIM CONSTRUCTION CORPORATION,** | ) | **Judge Rebecca R. Pallmeyer** |
| **INC., the CITY OF CRYSTAL LAKE, ILLINOIS,** | ) | |
| **ENVIROGEN TECHNOLOGIES, INC., and the** | ) | |
| **LAKE COUNTY PUBLIC WATER DISTRICT,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Westfield Insurance Company filed this action in 2015, seeking a declaration that Westfield had no obligation to defend or indemnify its insured, Defendant Maxim Construction Corporation, for claims brought against Maxim by the City of Crystal Lake and by Envirogen Technologies, Inc. The claims arose out of failures in a water treatment facility manufactured by Envirogen and installed by Maxim for the City of Crystal Lake, resulting in litigation in state and federal court. In a counterclaim against Westfield, Maxim alleges that Westfield's failure to accept defense of the claims was in bad faith and resulted in entry of a default judgment against Maxim. Both sides have moved for summary judgment. For the reasons set forth here, both motions are granted in part and denied in part.

## FACTS

The record is substantial, and certain critical facts are disputed. Much of the history is undisputed, however; in the statement of facts that follows, the court provides citations to the record only in instances of dispute.

### I.     The Parties

Westfield Insurance Company is incorporated under the laws of Ohio and has its principal place of business in Ohio. Defendant Maxim Construction Corporation is incorporated

in Illinois and has its principal place of business here as well.  Maxim and Westfield are parties to insurance policies in which Westfield provides liability insurance coverage for bodily injury or property damage caused by an "occurrence" within the policy period, subject to certain exceptions.  The policies also require Westfield to provide its insured with a legal defense against any covered claims.  The City of Crystal Lake ("City" or "Crystal Lake") is a municipality in Lake County, Illinois.  In this lawsuit, filed in October 2015, Westfield seeks a declaration that it owes no duty to defend or indemnify Maxim with respect to separate actions filed by the City and Envirogen in connection with Maxim's construction and installation of an allegedly defective water treatment system.[1]  Envirogen was originally named as a Defendant in this case, but has agreed to be bound by any judgment the court enters and has been dismissed from the lawsuit without prejudice.

## II.  Water Treatment System and Resulting Litigation

In August 2010, Maxim entered into an agreement to construct and install a water treatment system for the City of Crystal Lake.  Envirogen Technologies, Inc. was the manufacturer of the water treatment system.  Although the details are not clear, it appears that the installation did not go well.  It also appears that Maxim did not pay Envirogen the purchase price for the water treatment system.  On March 25, 2014, Envirogen sued Maxim in federal court, charging Maxim with patent infringement and with breach of the contract to pay the purchase price.  *See* No. 14 C 2090 (hereinafter, "*Envirogen* litigation").[2]  The case was assigned to Judge James Zagel of this court.  Maxim's attorney filed an appearance in that case on April 17, 2014.  Almost a year later, on March 19, 2015, Envirogen filed an amended

---

[1]      A third lawsuit also resulted from the water treatment project.  That lawsuit, filed by the Lake County Public Water District against Maxim, is not at issue in this case.

[2]      Envirogen alleged in the complaint in that action that its principal place of business is in Texas; its state of incorporation is not disclosed, but Westfield alleged in this case that Envirogen is incorporated in Delaware.

complaint in which it dropped its patent infringement claims, leaving only breach of contract claims for the unpaid purchase price of the system.[3]

In June 2015, the problems with the water treatment system generated another lawsuit, this one filed by the City of Crystal Lake against Maxim and Envirogen Technologies in state court in McHenry County, on June 25 (hereinafter, "*Crystal Lake* litigation"). The City alleged that it had contracted with Maxim to modify one of its water treatment facilities, and that Maxim subcontracted with Envirogen for the design and manufacture of the water treatment equipment to be installed in the modified facility. Crystal Lake alleged that the Envirogen equipment did not function properly despite numerous remediation efforts and never performed to specifications, and that Crystal Lake incurred significant expense to repair, maintain, and continue operating the Envirogen equipment. Crystal Lake also alleged property damage to the water treatment facility that Maxim worked on and to its public water supply system generally: Specifically, Crystal Lake alleged that it was "forced to operate its other potable water wells at greater capacities" than consistent with good practice and environmental concerns, and that the City had suffered damage to real property including "loss of the existing WTP#1 building"; the need to "substantially reconstruct or demolish" that building; a "shortened life expectancy" for the other water supply and treatment systems as a result of excess use and strain; and depletion of water resources from other "potable water wells." (Crystal Lake Complaint, Exhibit 1 to Plaintiff Westfield's Complaint [6] at ¶ 77 (g), (i).)[4] Crystal Lake's complaint included two counts: In Count I, Crystal Lake alleged that Maxim had breached the terms of its contract to build the water treatment system. Count II alleged that the City of Crystal Lake was a third-party

---

[3] Maxim acknowledges that patent infringement claims are not covered by the Westfield policies, and has effectively conceded that Envirogen's breach of contract claims are also not covered; Maxim did not provide Westfield with timely notice of those claims and did not include the Envirogen claim in its earlier motion for summary judgment (described below).

[4] Westfield denies that Crystal Lake alleged property damage, but cites nothing in support of the denial and makes no mention of these allegations of Crystal Lake's complaint.

beneficiary of Maxim's contract with Envirogen, and claimed that Envirogen was liable to the City for breach of the subcontract.

### III.    Maxim Requests Defense and Indemnity from Westfield

Maxim was not served with the *Crystal Lake* complaint until November 5, 2015.  It was aware of the lawsuit earlier, however:  Maxim tendered Crystal Lake's claim in the state court case to Westfield by way of an August 27, 2015 letter from Maxim's president, Dan Sjong, to Robert Hunt, a Westfield Claims Specialist, stating that the letter "shall serve as Maxim's formal notice and tender of defense and indemnity" in regard to Crystal Lake's lawsuit.  The letter specifically requested that Westfield "accept Maxim's defense and indemnity" in connection with the Westfield policy.  Sjong's letter noted the City's claims that, due to Envirogen's negligence, the City had sustained damage to property, materials, parts, equipment, and systems, "that were not furnished or installed by Maxim or Envirogen in connection with the Project and were neither part of Maxim nor Envirogen's work."  Specifically, Sjong noted, the City claimed that it had been forced to shut down one of its wells and that the failed system would cause additional damage to other components of the City's potable water system and other unidentified real property.  The City had also announced it might seek damages to other unidentified pumps that were not part of the project and was claiming loss of other unidentified portions of its water system, including other water treatment facilities.  Sjong pointed out that the City was claiming the failure to the system might result in contamination of water from a well that was subject to an Illinois EPA order.

Envirogen appeared in the *Crystal Lake* case through counsel on September 8, 2015, but Maxim never filed an appearance in that case.  (Westfield asserts that Maxim did file an appearance, but there is no evidence of this, and Maxim's counsel has submitted a declaration asserting that Maxim did not appear.)  (Maxim's Response to Westfield's Statement (hereinafter, "Maxim's Resp.") [130] ¶ 15, citing Declaration of Christopher Murdoch, Ex. A to Maxim's Resp. ¶ 4. )

4

On September 22, 2015, Sjong e-mailed Mr. Hunt, asking, "Any decision on the Crystal Lake claim?" Hunt responded two days later, "We are in the course of our investigation. Once the investigation is complete we will provide you our written position." Hunt went on to say that Westfield's investigation was "ongoing" and that Westfield reserved its right to raise defenses to coverage.

In the meantime, Envirogen's action against Maxim remained pending before Judge Zagel. On August 17, 2015, after it was served with a summons in Crystal Lake's state court case, Envirogen had filed a second amended complaint in federal court, adding Crystal Lake as a Defendant, and seeking a declaratory judgment that Crystal Lake was not a third-party beneficiary of the Envirogen-Maxim contract. Evidently prompted by Crystal Lake's presence in the federal case mix, on August 27, 2015, Maxim for the first time tendered its defense of Envirogen's claims to Westfield, as well.

By October 16, 2015, Sjong reported, the parties in the *Crystal Lake* state court litigation had begun settlement negotiations. Sjong told Hunt that Westfield's "delay in responding to the tender is operating to Maxim's prejudice." Hunt responded three days later that Westfield was continuing its investigation and would not respond "before the end of this week." Again, Hunt noted that Westfield reserved its right to raise any defenses to coverage. Finally on October 22, Westfield formally denied that it had any obligation to defend or indemnify Maxim under the policies, against either the *Crystal Lake* state court action or the *Envirogen* action pending in federal court. Westfield's letter reminded Maxim that it needed to arrange for its own defense but must nevertheless continue to "comply with the terms and conditions" of the insurance policies, including "providing Westfield with a copy of any additional papers filed against Maxim in any lawsuit in connection with these matters." On the same day, Westfield filed this action seeking a declaratory judgment that it had no duty to defend or indemnify Maxim.

## IV.    Westfield Accepts Defense Under a Reservation of Rights

Crystal Lake had moved to dismiss Envirogen's complaint against it in federal court, but Judge Zagel denied the motion on November 18, 2015.  Then on December 2, 2015, Crystal Lake moved its state court action to this courthouse, filing a cross-claim in the *Envirogen* litigation against Maxim for breach of contract and a counterclaim against Envirogen for breach of Envirogen's contract with Maxim.  Crystal Lake voluntarily dismissed its own state court case the following day.

Maxim admits that it did not give Westfield any additional notice of Crystal Lake's cross-claim at the time it was filed, and in fact did not formally notify Westfield of that claim before June 8, 2016.  On that date, Maxim notified Westfield of Crystal Lake's claim by filing its first motion for summary judgment in this case, in which it asserted that Westfield is responsible as a matter of law for Maxim's defense of Crystal Lake's claim.  (*See* Maxim's Motion for Partial Summary Judgment [35-1] at 2, 4.)  Maxim contends, however, that as of March 16, 2016, Westfield was on notice of Crystal Lake's cross-claim as a result of Crystal Lake's own action: Westfield was fully aware that Crystal had sued Maxim in state court; that case was the focus of Westfield's complaint in this declaratory judgment action.  Indeed, a copy of Crystal Lake's state court complaint was Exhibit A to Westfield's complaint in this declaratory judgment action. (Complaint, Exhibits [6-1] at 2-15 of 52.)  On March 16, 2016, in an answer to Westfield's own complaint in this case, Crystal Lake explained that its state court suit had been voluntarily dismissed, and that the City's "claims were re-filed in response to a complaint filed in this court by Envirogen."  (Maxim's Resp., Additional Facts ¶ 30, citing Crystal Lake's Answer [30] ¶ 9.) The motion for summary judgment that Maxim filed in June 2016 in this case was aimed squarely at the City's cross-claim, and argued only that Westfield has a duty to defend Maxim against that cross-claim filed by Crystal Lake in the *Envirogen* federal case.

At least from the timing, it appears that Maxim's motion for summary judgment altered Westfield's position.  Soon after Maxim filed that motion, on June 17, Westfield's attorney, David

Osborne, contacted Maxim's attorney, Keith Carlson, and left a voice mail message in which Westfield agreed to defend Maxim "going forward" under a reservation of rights. Maxim contends that in that voicemail, Westfield proposed to provide counsel under a reservation of rights only if Maxim waived its right to reimbursement for the fees and costs Maxim had already incurred to defend itself. In support, Maxim cites Keith Carlson's deposition testimony concerning his communications with David Osborne. (Maxim Resp. ¶ 32, citing Carlson Deposition, Ex. D to Maxim's Resp., at 52-53, 108-111.) Westfield acknowledges that in the June 17, 2016 voicemail, Osborne advised Carlson that Westfield agreed to appoint counsel to defend Maxim under a reservation of rights moving forward in the *Crystal Lake* state court case (Osborne evidently was unaware that case had been voluntarily dismissed) and in the federal *Envirogen* case. (Westfield's Response to Defendant's Statement of Facts [132-2] ¶ 24.)

Carlson spoke with Westfield's attorney on June 24. Carlson objected to the proposal that Westfield provide Maxim with "panel" counsel, a proposal that, Carlson asserted, created a conflict of interest. Osborne argued that there is no conflict of interest under these circumstances and cited caselaw for that proposition.[5] Carlson also objected to the proposal that Maxim waive any claim for costs and expenses it had incurred to date, but said he would discuss the proposal with his client, who, Carlson noted, was often difficult to reach. Maxim also cites a letter Carlson wrote to Osborne on July 6, 2016, which begins: "With respect to Westfield's settlement offer of paying only defense costs going forward with panel counsel of Westfield's choosing and maintaining a reservation of rights, that is not acceptable." (Carlson July 6, 2016 letter, Ex. 4 to Carlson Deposition [130-3], page 180 of 297.) Westfield denies that its offer to defend Maxim was conditioned on Maxim's waiver of any other rights, but there is no indication that Westfield attempted to correct Carlson's purported misapprehension.

---

[5] *See Stoneridge Dev. Co. v. Essex Ins. Co.*, 382 Ill. App. 3d 731, 741-47, 888 N.E.2d 633, 644-49 (2nd Dist. 2008). As discussed *infra*, *Stoneridge* does not obviously support the conclusion that the situation here did not present a conflict of interest.

(Westfield's Response to Defendant's Statement of Facts ¶ 5, citing Osborne Affidavit, Exhibit B to Westfield's Response [132-4] ¶¶ 3-7, 10.)

**V.    Maxim's Default in the *Envirogen* Case**

Though Westfield was, by early July, prepared to provide a defense to Maxim "going forward," Maxim's defense position had already fallen apart.  Westfield contends that in the July 6 letter, Westfield learned for the first time that law firms Maxim had hired on its own to defend it in the *Envirogen* litigation had been granted leave to withdraw two months earlier, on May 9.  It is now undisputed that in their motions for leave to withdraw, filed early in May, Maxim's attorneys asserted that they had not been paid since the case was filed, in 2014, and that they had warned Maxim as early as 2015 that they would withdraw unless paid.  Maxim's principal, Dan Sjong, was aware of counsel's intent to withdraw as early as April 2016 and had written notice of this by May 6.

Maxim denies that Carlson's July 6 letter was the first notice to Westfield of counsel's withdrawal.  Maxim's support for this denial is thin:  Maxim cites Carlson's statement, in the letter, *"[a]s you further know*, defense counsel had to withdraw because they were not bring paid due to Westfield's abandonment of its insured."  (Carlson July 6 letter, emphasis supplied.)  Maxim also cites Carlson's deposition testimony that, although he has no specific memory of having previously advised Westfield about counsel's withdrawal, he would not have used the expression "[a]s you further know" unless he had been confident that Westfield was in fact on notice of this.  (Maxim Resp. ¶ 34; Westfield's Resp. [130], 32; Carlson Dep. [130-3], at 64-67, 77-85, 86, 91.)  Westfield notes that Carlson has produced no correspondence showing that he advised Osborne that counsel had withdrawn prior to July 6, 2016.  Carlson himself testified that he only became aware that Maxim had failed to appear for status conferences at some point after the missed status conference on June 23.  (Carlson Dep. at 82-86); he testified that he believes (apparently because he serves as counsel only with respect to insurance coverage matters) that he had no authority or responsibility to contact the court in the *Envirogen* case to

attempt to head off a default. (*Id.* at 88.) And Maxim admits that the July 6 letter was Westfield's first notice that Maxim had failed to appear in court for two consecutive status conferences before Judge Zagel.

The parties also agree that in the July 6 letter, Maxim rejected Westfield's proposal to provide a defense on the conditions that Westfield be permitted to choose Maxim's counsel, and that Maxim waive a claim for fees incurred to date. In Robert Hunt's July 12, 2016 letter in response, Westfield stood by its reservation of rights. Of the 18 pages in Hunt's letter, 16 consist of lengthy quotations from the Westfield policy. Significantly, however, though Hunt cited numerous policy exclusions in the July 12 letter, in that letter Westfield nevertheless agreed to "reimburse [Maxim] for all reasonable attorney's fees and litigation costs incurred by you from the date of your first notice of suit to Westfield to the present," and requested that Maxim "forward your invoices and proof of payment of same[.]" The letter also identifies counsel who would represent Maxim in the litigation filed by the City of Crystal Lake. (Hunt July 12, 2016 letter, Ex. 13 to Carlson Deposition [130-3], page 254 of 297.) Two days later, Hunt sent a nearly identical letter, agreeing to take on the defense of the Envirogen claims, using the same retained attorney. (Hunt July 14, 2016 letter, Ex. 14 to Carlson Deposition [130-3], pages 255-272 of 297.) But after Maxim objected, on July 18, 2016, to Westfield's selection of counsel, Westfield capitulated and agreed two days later to retain Maxim's prior attorneys and provide a defense under a reservation of rights.

Westfield first retrieved a copy of Crystal Lake's cross-claim against Maxim from the electronic docket on July 12, 2016. Westfield's attorney did not review the records of Crystal Lake's state court case at any time while that case was pending or before filing its motion for summary judgment in this case. Westfield took no steps to keep apprised of the state court action while it was pending. Nor did counsel for Westfield review the federal court records or take any steps to remain apprised of developments in the *Envirogen* litigation

## VI.    Westfield Reimburses Maxim for Past Defense Costs

In an August 26, 2016 letter, counsel for Westfield outlined objections to bills submitted by Maxim's lawyers but confirmed that Westfield intended to "reimburse Maxim moving forward for the reasonable fees and costs" incurred by counsel and to reimburse Maxim for reasonable fees and costs incurred previously.  Though Maxim challenged some of Westfield's objections, ultimately, in September 2016, Westfield confirmed its approval of payments to law firms that had represented Maxim, in the amount of nearly $40,000 to one law firm and $16,000 to another.  In a September 22, 2016 letter, Westfield asserted that these payments, and its agreement to defend the *Envirogen* litigation under a reservation of rights, satisfied Westfield's obligations to Maxim.  Westfield asked Maxim to clarify whether it believed it was still owed defense fees and costs or that "any demand made" in the motion for summary judgment filed on June 8 "remains unresolved."  Maxim responded the following day with an e-mail message requesting an additional $740 and promising to respond "soon" to Westfield's remaining questions.  After Westfield forwarded the additional money and repeated its questions, Maxim responding by explaining that it did not expect to present any additional bills for services performed by its law firms, but that Maxim was "still considering [its] options regarding pre-tender fees and costs as well as costs in the *Envirogen* case prior to the December 2, 2015 cross-claim by the City of Crystal Lake."  Since that time, Maxim has not identified any additional unpaid fees incurred after the date it tendered defense of the litigation to Westfield, and has conceded that patent infringement claims asserted in Envirogen's original complaint did not trigger a duty to defend.

## VII.    Default Judgments are Entered Against Maxim

As noted, Maxim's attorneys in that federal litigation had withdrawn in May, and no lawyer appeared on Maxim's behalf on two consecutive status hearings, one in May and a second one on June 23, 2016.  On July 7, 2016, Judge Zagel entered a default against Maxim

based on Maxim's failure to appear.[6]  Envirogen noticed its motion for a default judgment for a hearing on July 21.  On July 20, the attorneys who had represented Maxim earlier filed appearances in the *Envirogen* action and a written response to the motion for default judgment, but it was too late: on August 12, 2016, Judge Zagel entered a default judgment in favor of Envirogen.  Judge Zagel wrote that although Maxim had recently reappeared, Maxim had not shown good cause for its failure to appear at two status hearings or to notify the court of its efforts to obtain substitute counsel.  Envirogen's list of damages included the remaining unpaid principal on Maxim's purchase of the Envirogen system, plus prejudgment and postjudgment interest, fees, and costs.  On September 6, Judge Zagel awarded Envirogen $517,706.46 plus interest.  Crystal Lake, too, moved for judgment against Maxim "in the amount equal to the losses it incurred because of the flawed Envirogen system," and that would put the City "into the position it would have been had Maxim not breached the Construction Contract."  Crystal Lake's motion sought disposal fees and costs of waste water; costs to demolish the Envirogen system; materials and labor costs of operating that system at low capacity; costs of extraordinary cleaning and repair; costs to construct and install an ion exchange system compliant with specifications; costs of more expensive and greater amounts of salt; cost of constructing "the inoperable . . . system"; costs of labor and overtime for persons who attended to the Envirogen system when it malfunctioned; and costs to pay the City's consulting engineer for additional rehab work.

Maxim moved to vacate the entry of default and objected to entry of judgment in favor of Crystal Lake, asserting that it had been engaged in "ongoing discussion" with the law firm identified by Westfield and that a conflict of interest precluded that firm from appearing on Maxim's behalf.  As he had before, however, Judge Zagel concluded, in his September 30 order

_____

[6]     Maxim denies this, asserting that the default was entered on the basis of Maxim's "failure to answer or otherwise plead."  The Clerk's docket entry does so state (*See* Docket No. 142 in 14 C 2090), but Maxim had indeed filed an answer.  Review of the docket in the *Envirogen* case confirms that Maxim's failure to appear in court was the reason for Judge Zagel's entry of default.

entering judgment for Crystal Lake, that Maxim had no adequate explanation for its failure to contact the court or seek a continuance. The parties submitted materials on Crystal Lake's damages claims. For its part, Maxim acknowledged that the claimed damages consisted of Crystal Lake's costs to remove and replace the Envirogen system, the costs of attempting to rehabilitate that system, and attorneys' fees and costs. Maxim nevertheless continued to object to entry of default judgment. This objection did not move Judge St. Eve, to whom the case had been reassigned. She wrote:

> Maxim's excuse [for failure to appear]—that its insurer denied coverage for a period of time—is not a good one. Maxim—a sophisticated business entity involved in a major project with Envirogen and Crystal Lake—previously had experienced counsel in this action and it had legal representation in a separate declaratory judgment action against its insurer.

(Order [180] in *Environment Technologies, Inc. v. Maxim Const. Corp.,* No. 14 C 2090, at 4 n.4.) Judge St. Eve observed, further, that Maxim could have "hired counsel for the limited purpose of contacting the court" or asked counsel representing Maxim in this declaratory judgment action to do so, and that Maxim's decision to hire counsel to represent it in this case rather than the Envirogen litigation "does not excuse its nonappearance and lack of communication with the court." (*Id.* at 5 n.5.) On January 24, 2017, the court awarded judgment in favor of Crystal Lake in the amount of $1,099,814.01 and $94,028.88 in attorneys' fees.

VIII.    **Terms of the Westfield/Maxim Insurance Policies**

As the court understands the insurance coverage at issue, Westfield's general liability policy has a limit of coverage for property damage in the amount of $1,000,000 per occurrence. Westfield also provides excess umbrella coverage of $9,000,000 per occurrence. The two types of policies have very similar terms. Although the policy language is laid out at length in the record, the court has attempted to summarize relevant provisions here.

A.    **Commercial General Liability Coverage**

Westfield issued a Commercial General Liability ("CGL") insurance policy to Maxim in September 2010 and renewed it annually through January 2016. The policy provides coverage

for bodily injury or property damage caused by an "occurrence" within the policy period. The policy also provides for coverage of expenses in defending claims. In situations "when the duty to defend exists," the policy covers the insurer's own defense cost, together with the expenses incurred by the insured to assist in investigation of the defense, as well as costs and interest on any judgment. (Policy, Supplementary Payments – Coverages A and B.)

The policy includes numerous exclusions, however: The policy does not cover any claim for which Maxim had assumed liability in a contract. (Policies, Complaint Exhibits D, E, F, G, [6-4 through 6-9], Coverage A Exclusion 2(b)). It does not cover damage to real property that arises out of Maxim or its contractors' operations, or the cost of repairs necessary because Maxim's work was incorrectly performed. (*Id.* 2(j)(5), (6).) It does not cover damage to Maxim's own product or its own work, unless that work was performed by a subcontractor. (*Id.* 2(k), (l).) It does not cover property damage resulting from any defect or deficiency in Maxim's own work, or resulting from any delay or failure in completing that work. (*Id.* 2(m)(1), (2).) And the policy excludes coverage for loss or expense resulting from loss of use or repair or replacement of work because a defect or deficiency in that work. (*Id.* 2(n).) The policy covers "personal and advertising injury liability," but carves out and excludes coverage for patent infringement. (Policy, Coverage B Exclusion 2(i).)

The policy imposes duties on the insured, as well. Most notably, the insured is required to notify Westfield "as soon as practicable" of an occurrence that may result in a claim. (Policy, Section IV – Commercial General Liability Conditions (2).) The notice is to include a statement of how, when, and where the occurrence took place; the names of any injured persons or witnesses; and the nature and location of any injury or damages arising from the occurrence. If any claim is made or suit is filed, the insured is required to "immediately record the specifics of the claim or 'suit'" and the date on which it was received, and notify Westfield "as soon as practicable." The insured is also required to "immediately send [Westfield] copies of any

demands, notices, summonses or legal papers received in connection with the claim or 'suit'. . . ."  (*Id.*)

Finally, the policy includes definitions of "bodily injury," "impaired property," "insured contract," "occurrence," and "personal and advertising injury."  (Policy, Section V – Definitions 3, 8, 9, 13, 14.)  The policy provides coverage for amounts the insured become obligated to pay for property damage to the insured's work falling within the "products-completed operations hazard," defined to include property damages "arising out of the insured's work except for work not yet completed."  Work "that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed."  (*Id.* 16(a).)  Products-completed operations hazard does not include injury or damage arising out of the transportation of property, with certain exceptions, and does not include tools, uninstalled equipment or abandoned or unused materials.  (*Id.* 16(b).)  "Property damage" is defined as physical injury to tangible property, and resulting loss of use, as well as loss of use of tangible property that is not physically injured.  (*Id.* 17.)  The policy defines "your product" as goods or products sold or handled by the insured, and includes warranties or representations made concerning those products.  (*Id.* 21.)  It defines "your work" as work or operations performed by the insured, or on its behalf, as well as materials, parts or equipment furnished in connection with that work.  (*Id.* 22.)

**B.      Commercial Umbrella Policy Provisions**

The parties agree that the Westfield policies contain "commercial umbrella coverage" provisions, many of them similar to what appears in the policy described above.  The umbrella provisions confirm that Westfield will pay "ultimate net loss" in excess of the "retained limit" that Maxim becomes liable to pay for bodily injury or property damages, and that Westfield has the right and duty to defend against any suit for bodily injury or property damage covered by the policy.  (Umbrella Policy, Coverage A(1).)  The umbrella provisions contain exclusions; Westfield is not liable for "damages by reason of the assumption of liability in a contract or

14

agreement." (*Id.* 2(b).) Nor is Westfield liable for property damage to any real property on which Maxim or its subcontractors are working, if the property damage arises out of those operations. (*Id.* 2(m)(5).) Westfield also is not liable for any part of property that must be restored or repaired because Maxim's work was incorrectly performed. (*Id.* 2(m)(6).) Westfield is not liable for damage to Maxim's product or its work, nor for damage to property not physically injured, arising out of defects or delays in Maxim's work, or that of anyone acting on its behalf, unless the loss of property is the result of a sudden or accidental physical injury to the work. (*Id.* 2(o),(p).) Westfield is not liable for damages incurred by Maxim or others for loss of use of Maxim's product, or work. (*Id.* 2(q).)

Like the CGL policy, the umbrella policy requires Maxim to notify Westfield as soon as practicable of an occurrence or offense which may result in a claim, to notify Westfield if any claim is made or suit filed, and to immediately provide Westfield with copies of any demands, notices, summonses, or legal papers. The umbrella policy excludes coverage for "impaired property," defined as tangible property rendered less useful because it incorporates Maxim's defective work product or because Maxim failed to fulfill the terms of a contract. (Umbrella Policy, 2. Exclusions (p)(1), (2); Section V - Definitions 8.) It defines an insured contract as one in which Maxim assumes tort liability for another party for bodily injury or property damaged caused by Maxim. (*Id.* 9(g).)9 It defines "occurrence" as an accident, including exposure to harmful conditions. (*Id.* 13.) It defines "products-completed operations hazard" as bodily injury or property damage occurring away from Maxim's presence and arising out of its work, except for work not yet completed. (*Id.* 17(a), (b).) Property damage is defined as physical injury to tangible property, or loss of use of tangible property that is not physically injured. (*Id.* 18.) Maxim's "product" is defined as any goods or products sold by Maxim or containers, materials, parts or equipment furnished in connection with such goods, and includes warranties or representations about those goods, and Maxim's "work" means the work or operations

performed by Maxim and materials or equipment furnished, along with warranties or representations. (*Id.* 27, 28.)

**DISCUSSION**

## I.     Westfield's Motion for Summary Judgment

Westfield filed this action for a declaratory judgment that it has no duty to defend or indemnify Maxim.  Though its briefs are lengthy, Westfield's key arguments are (1) that coverage for the loss at issue is excluded by a number of policy provisions and (2) that Maxim failed to provide appropriate notice of the claims against it, as required by the terms of the policy.  In any event, Westfield contends, it was Maxim's conduct, not Westfield's, that resulted in entry of a default judgment against Maxim.  The court addresses these issues in turn.

### A.     Westfield's Duty to Defend

Westfield's factual submissions, like its correspondence with Maxim, are long on policy provisions but relatively short on the nature of the claims against Maxim.  In general, however, Westfield contends that its Commercial General Liability Policy provides no coverage for losses or expenses resulting from the loss of use, repair, removal or disposal of the insured's product or its work.  (Commercial General Liability Policy, Coverage A, Exclusion n.)  The Commercial Umbrella policy, similarly, excludes coverage for property that must be "restored, repaired or replaced" because the insured's work was "incorrectly performed on it." (Commercial Umbrella Liability policy, Coverage A, Exclusion m.)  Those exclusions, Westfield believes, support its refusal to provide a defense to Maxim.

These exclusions do limit Westfield's duty to indemnify, but it is settled law that an insurer's duty to defend its insured is much broader than its duty to indemnify.  *Outboard Marine Corp. v. Liberty Mutual Ins. Co.*, 154 Ill. 2d 90, 125, 607 N.E.2d 1204, 1220 (1992).  To determine whether an insurer owes a duty to defend, the court compares the allegations in the claim or complaint against the insured with the insurance policy language.  *Lagestee–Mulder, Inc. v. Consolidated Insurance Co.*, 682 F.3d 1054, 1056 (7th Cir. 2012).  The duty to defend is

broader than the duty to indemnify because insurers must defend their policyholders in actions that are even potentially within policy coverage. *Lagestee–Mulder*, 682 F.3d at 1056; *CMK Development Corp. v. West Bend Mutual Ins. Co.*, 395 Ill. App.3d 830, 839, 917 N.E.2d 1155, 1163 (1st Dist. 2009). If the underlying complaint alleges facts potentially within policy coverage, insurers are obligated to defend their policyholders, even if the underlying allegations are groundless, false, or fraudulent. *CMK Development*, 395 Ill. App. 3d at 839, 917 N.E.2d at 1163. Thus, this court can declare that Westfield owed Maxim no duty to defend it only if it is clear from the face of the underlying complaint that Crystal Lake's claims do not fall within the scope of coverage. *Lagestee–Mulder*, 682 F.3d at 1056. Put another way, the duty to defend arises if, liberally construing the allegations in a complaint against the insured, there are factual allegations that potentially fall within the coverage. *General Agents Ins. Co. v. Midwest Sporting Goods Co.*, 215 Ill.2d 146, 154–55, 828 N.E.2d 1092, 1098 (2005). And if a complaint against an insured presents more than one theory of recovery but at least one is potentially covered, the insurer is required to provide a defense. *Id.* at 155, 828 N.E.2d at 1098. This means that an insurer may be required to provide a defense against causes of action and theories of recovery that are not actually covered by the policy. *Illinois Masonic Medical Ctr. v. Turegum Ins. Co.*, 168 Ill. App. 3d 158, 162, 522 N.E.2d 611, 613 (1st Dist.1988).

Maxim contends these principles amply support the conclusion that Westfield breached its duty to defend. Maxim notified Westfield of the lawsuit filed by Crystal Lake in state court on August 27, 2015. Maxim argues that Crystal Lake's allegations presented claims of damage to property and facilities not excluded by the terms of the policy: specifically, damage to the water treatment facility that Maxim worked on and to its public water supply system generally: Crystal Lake alleged that it was required to overtax other water wells, resulting in a "shortened life expectancy" for the other water supply and treatment systems; that it had suffered loss of the "existing WTP#1 building;" that it was required to "substantially reconstruct or demolish" that building; and that it suffered depletion of water resources from other "potable water wells."

Westfield's refusal to provide Maxim a defense against these allegations was particularly egregious, Maxim contends, in context. On November 25, 2015, just one month after Westfield's filing of this declaratory judgment motion, Judge Jack Blakey of this court decided *Westfield Ins. Co. v. National Decorating Serv., Inc.*, 147 F. Supp. 3d 708 (N.D. Ill. 2015), a case that involves the same plaintiff, the same insurance policy, and effectively the same issue presented in this case. Judge Blakey characterized the question before him this way: "Is there an 'occurrence' under standard-form comprehensive general liability ("CGL") policies when the named insured contractor's faulty workmanship causes damage to a building that is beyond the scope of its own work there?" *Id.* at 709. The claim for which a defense was requested in that case grew out of the construction of a multi-story condominium building in Chicago. The condo association sued the contractor for "significant cracking" of walls and ceilings, "significant leakage" through exterior walls and windows, "defects to the common elements," and damage to ceilings floors, painting, drywall, and furniture. In addressing this issue, the court noted that under Illinois law, "in order for a construction defect to qualify "as an 'occurrence,' it must damage something other than the 'project itself' or the 'building itself.'" *Id.* at 713-14 (citing *Milwaukee Mutual Ins. Co.* v *J.P. Larsen*, 2011 IL App (1st) 101316956 ¶ 26, 956 N.E.2d at 531–32; *CMK Development*, 395 Ill. App.3d at 840, 917 N.E.2d at 1164–65; *Monticello Ins. Co. v. Wil–Freds Construction, Inc.,* 277 Ill. App. 3d 697, 705, 661 N.E.2d 451, 456–57 (2d Dist. 1996)). The court also recognized that, as Westfield emphasizes in this case, commercial general liability insurance is not intended to pay the costs associated with repairing or replacing "the policyholder's defective work and products, which is an economic loss." *Id.* at 716. When the policyholder's work results in damage to parts of a building or project beyond the scope of that work, however, the insurer has a duty to defend. *Accord Acuity v. Lenny Szarek, Inc.,* 128 F. Supp. 3d 1053, 1059 (N.D. Ill. 2015) (if "defective workmanship results in damage to something other than the construction project itself, there may be an occurrence [triggering CGL coverage]").

Westfield appealed Judge Blakey's decision, but the Seventh Circuit affirmed. *See Westfield Ins. Co. v. National Decorating Service, Inc.*, 863 F.3d 690 (7th Cir. 2017), *reh'g and suggestion for reh'g en banc denied* (Aug. 14, 2017). On appeal, Westfield argued that its insured's "failure to apply a thick enough coat of paint"—that is, failure to perform its work properly—cannot be characterized as an "accident." *Id.* at 696. True, the Court of Appeals said, "damage to a construction project that occurs as a result of a construction defect, does not constitute an 'accident' or 'occurrence.' " *Id.* at 697. But "negligently performed work or defective work" may nevertheless "give rise to an 'occurrence'" under a liability policy, in a situation where "the policy defines an 'occurrence' to include not only an accident, but also 'continuous or repeated exposure to conditions.'" *Id.* As noted, in the *National Decorating Service* case, the district court and the Seventh Circuit were interpreting the same CGL policy at issue in this case, containing the identical definitions, in a declaratory judgment action filed by Westfield—the very party seeking a declaratory judgment before this court. And Westfield was represented in that case by the same attorneys who represent it here.

Westfield could not have known how Judge Blakey would rule at the time that it filed this declaratory judgment action, but once he did rule, Westfield's failure to bring the *National Decorating Service* case to this court's attention promptly is disappointing. Nor is Westfield's effort to distinguish the case convincing: Westfield contends the Seventh Circuit found that the duty to defend was triggered by an allegation of negligence. (Westfield's Resp. [312-1] at 19.) In fact, the Court of Appeals referred to "negligently performed work *or defective* work, 863 F.3d 697 (emphasis supplied), and emphasized that the claimed damage was to "parts of the building that were outside the scope of the work for which [the insured] was engaged." *Id.* at 693.

As Maxim notes, Westfield has offered no explanation for its refusal to offer a defense when Maxim notified it of the *Crystal Lake* lawsuit. Westfield's claim adjuster advised Maxim's president that Westfield was "investigating" the claim, but no evidence concerning that investigation, or its result, appears in the record. Nor has Westfield adequately explained the

reason for its change of heart and decision to defend Maxim beginning in June 2016.[7]  Perhaps Westfield recognized (after reviewing Maxim's motion for summary judgment, or perhaps for other reasons) that the policy terms do not clearly defeat the duty to defend.  Westfield did not, however, withdraw its request for a declaratory judgment.  Westfield's request for a declaratory judgment that the terms of the policy do not require Westfield to defend Maxim against the *Crystal Lake* claim is denied.  On that issue, Maxim's motion is granted.

### B.    Maxim's Duty to Notify Westfield

Westfield also argues that Maxim failed to give timely notice of the claims for which it now seeks a defense.  It is undisputed that the policy requires Maxim to notify Westfield "as soon as practicable of an 'occurrence' or an offense" that might result in a claim, provide Westfield with written notice of any suit or claim as soon as practicable, and "immediately" send Westfield copies of any "demands, notices, summonses, or legal papers" relating to any claim or suit.  Notice provisions in insurance policies are reasonable and enforceable.  *See State Auto Property and Casualty Ins. Co. v. Brumit Services, Inc.,* 877 F.3d 355, 357 (7th Cir. 2017) (citing *Barrington Consol. High School v. American Ins. Co.*, 58 Ill. 2d 278, 281, 319 N.E.2d 25, 27 (1974)).  Under Illinois law, a notice provision in an insurance policy is a "condition precedent" to trigger the insurer's contractual duties.  *AMCO Ins. Co. v. Erie Ins. Exchange*, 2016 IL App (1st) 142660, ¶ 21, 49 N.E.3d 900, 907-08 (1st Dist. 2016).  If the insured fails to comply with the notice provision, "the insurer may be relieved from its duty to defend and indemnify the insured under the policy." *Id.* (quoting *Northern Ins. Co. of New York v. City of Chicago*, 325 Ill. App. 3d 1086, 1091-92, 759 N.E.2d 144, 149 (1st Dist. 2001)).  The purpose of requiring notice is to enable the insurer to conduct a prompt and thorough investigation of the insured's claim and to

---

[7]    The closest that Westfield comes is its assertion that it was not until June 8, 2016, that Maxim invoked a "little-used definition of 'Property Damage' in sub-paragraph b." of the liability policy, "which provides coverage for '[l]oss of use of tangible property that is not physically injured.' " (Westfield's Memorandum [92-1], at 14.)  The court is not moved by the suggestion that Westfield can be excused for a lack of familiarity with the terms of its own policies, even those that are "little-used."

gather and preserve evidence. *Commercial Underwriters Ins. Co. v. Aires Environmental Services, Ltd.*, 259 F.3d 792, 795-96 (7th Cir. 2001); *Berglind v. Paintball Business Ass'n*, 402 Ill. App.3d 76, 85, 930 N.E.2d 1036, 1044 (1st Dist. 2010). The Illinois Supreme Court has held that the policyholder will be barred from recovery under the policy if he fails to give reasonable notice, even if the insurer is not prejudiced by the lack of timely notice. *Country Mutual Ins. Co. v. Livorsi Marine, Inc.*, 222 Ill. 2d 303, 317, 856 N.E.2d 338, 346 (2006).

As described above, two lawsuits grew out of the installation of a water treatment facility. The first was the *Envirogen* case, filed in federal court in 2014. Maxim gave Westfield no notice of that case for more than a year. But Maxim does not seriously contend that the claims leveled by Envirogen—for breach of contract and patent infringement—are covered by the Westfield commercial liability policy, and the court concludes that Maxim's failure to give Westfield notice of Envirogen's claim would defeat any request for a defense against those claims.

For its part, Westfield cannot seriously contend that Maxim failed to give it timely notice of Crystal Lake's lawsuit. Crystal Lake sued Maxim in June 2015, and Maxim notified Westfield of the lawsuit in August of that year, even before Maxim was served with process. Instead, Westfield focuses on Maxim's failure to advise it that Crystal Lake had filed a cross-claim against Maxim in the federal case. As explained earlier, Crystal Lake had moved to dismiss Envirogen's claims against it but, when that motion was denied, dismissed its state court case without prejudice and reasserted its same claims in federal court. Westfield faults Maxim for not bringing this to Westfield's attention; Westfield's counsel, David Osborne, says he was not aware of the cross-claim until Maxim filed its motion for summary judgment in this case. But the court agrees with Maxim that Westfield had ample notice of Crystal Lake's cross-claim. Westfield named Crystal Lake as a Defendant in this very declaratory judgment action, attaching a copy of the *Crystal Lake* complaint as Exhibit A to Westfield's own complaint. In March 2016, in its answer to Westfield's allegation about the City's claim against Maxim, the City of Crystal Lake explained that "the City Suit was voluntarily dismissed, and its claims were

re-filed in response to a complaint filed in this Court by Envirogen." Westfield asserts that it was "investigating" the claims against Maxim (filed in both state and federal court) in order to determine whether they were covered. Under those circumstances, Westfield did not require a reminder from Maxim after Crystal Lake itself notified Westfield that its claims against Maxim had been moved from state to federal court.

If Maxim contests the issue of notice of Envirogen's claim against it, Westfield is entitled to a declaratory judgment that Maxim failed to notify it of that claim. With respect to Crystal Lake's claim, Westfield's request for judgment on the notice issue is denied.

## II.     Maxim's Motion for Summary Judgment

Maxim has now filed a cross-motion for summary judgment, asking the court to declare that Westfield had a duty to defend Maxim against the claims asserted by Crystal Lake; that Westfield's failure to provide a defense was vexatious and therefore violated 215 ILCS 5/155; and that Westfield's failure to either promptly defend Maxim against Crystal Lake's claims, or seek a declaratory judgment that it has no duty to do so, estops Westfield from asserting policy defenses to indemnifying Maxim for the judgment against it.

For the reasons explained above, the court has concluded that Westfield did have a duty to defend Maxim. That leaves the issues of whether Westfield's failure to provide a defense was vexatious, and whether Westfield is estopped from asserting policy defenses to indemnification. The parties have also devoted considerable attention to the question of which side bears responsibility for the entry of default judgment against Maxim in the *Envirogen* litigation. Not addressed by the parties, but of concern to the court, is whether Maxim had a defense to the claims brought by Crystal Lake. The court's discussion of those issues follows.

### A.     215 ILCS 5/155

Section 155 of the Illinois Insurance Code provides "an extracontractual remedy to policyholders" in actions by or against an insurer that concern the liability of the insurer, the amount of the loss, or a delay in settling. *Cramer v. Insurance Exchange Agency*, 174 Ill. 2d

513, 520, 675 N.E.2d 897, 901 (1997). Section 155 of the Insurance Code provides that in any case "by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees" and other amounts. 215 ILCS 5/155(1) (West 2014). The statute thus authorizes the court to award attorney's fees and "other costs" to the insured if "it appears to the court" that the insurer's "action or delay is vexatious and unreasonable." 215 ILCS 5/155; *Employers Insurance of Wausau v. Ehlco Liquidating Trust*, 186 Ill. 2d 127, 159–61, 708 N.E.2d 1122, 1139 (1999). The mere fact that an insurer delays in settling the claim does not establish a violation of section 155, nor does the fact that the insurer litigated, but lost, the issue of insurance coverage. *Mobil Oil Corp. v. Maryland Casualty Co.*, 288 Ill. App. 3d 743, 752, 681 N.E.2d 552, 558 (1st Dist. 1997). Nor is an award under this section appropriate when "(1) there is a bona fide dispute concerning the scope and application of insurance coverage, (2) the insurer asserts a legitimate policy defense (3) the claim presents a genuine legal or factual issue regarding coverage, or (4) the insurer takes a reasonable legal position on an unsettled issue of law." *Citizens First National Bank of Princeton v. Cincinnati Ins. Co.,* 200 F.3d 1102, 1110 (7th Cir. 2000) (internal citations omitted).

As Maxim sees things, the case for an award under Section 155 is a strong one. An insurer's duty to defend its insured is much broader than its duty to indemnify the insured. *Outboard Marine*, 154 Ill. 2d at 125, 607 N.E.2d at 1220. In a case where the complaint against the insured alleges facts that fall or even potentially fall within the policy's coverage, the insurer has a duty to defend, even if the allegations in the underlying complaint are groundless, false, or fraudulent. *General Agents Insurance Co. of America, Inc.*, 215 Ill. 2d at 146, 155, 828 N.E.2d at 1098. The claims against Maxim did at least potentially fall within the policy's coverage, Maxim contends. Yet Westfield initially declined its request for coverage, even in the face of the

on-all-fours *National Decorators* decision. Then, when Westfield belatedly offered a defense, it initially demanded that Maxim waive any claim for defense costs incurred up to the time of Westfield's involvement and refused to provide Maxim with conflict-free counsel. This conduct, Maxim asserts, defeats any argument that Westfield acted in good faith when it filed this declaratory judgment action for a neutral assessment of its duty to defend.

Westfield emphasizes that an award under section 155 is not appropriate where there is a genuine dispute about coverage. In this case, Westfield asserts, it took appropriate steps when notified by Maxim of the claims made by Crystal Lake: two months after receiving notice, Westfield filed this action. Illinois law is clear that when an insurer is uncertain about its duty to defend an insured, the insurer has two choices: the insurer may defend the suit against its insured under a reservation of rights, or the insurer may instead seek a declaratory judgment that there is no coverage. *Midwest Sporting Goods Co.*, 215 Ill. 2d at 155, 828 N.E.2d at 1098. Failure to take one of these steps can mean that the insurer "is estopped from later raising policy defenses to coverage and is liable for the award against the insured and the costs of the suit, because the duty to defend is broader than the duty to pay." *Murphy v. Urso*, 88 Ill. 2d 444, 451, 58 Ill. Dec. 828, 430 N.E.2d 1079 (1981). Westfield's prompt filing of a declaratory judgment action arguably shields it from liability for a vexatious duty to defend under Section 155, as well. *Cf. Soto v. Country Mutual Ins. Co.*, 2017 IL App (2d) 160720-U ¶ 22 (2d Dist. May 11, 2017) (affirming award under Section 155 and distinguishing cases cited by insurer on the basis that in those other cases the insurers had "filed declaratory judgment actions or otherwise litigated their defenses to coverage or other obligations").

Whether an insurer's conduct is "'vexatious and unreasonable' presents a question of fact, assessed based on the totality of the circumstances, . . . ." *Amco Ins. Co. v. Paul Ries & Sons, Inc.*, 2017 IL App (1st) 160856-U ¶ 18 (1st Dist. Mar. 14, 2017), citing *Cook v. AAA Life Ins. Co.*, 2014 IL App (1st) 123700 ¶ 48, 13 N.E.2d 20, 37 (1st Dist. 2014). Factors relevant to the determination in this case include the insurer's "attitude," whether the insured was forced to

sue the insurer, whether the insured was "deprived of use of its property," whether there was a bona fide coverage dispute, "the extent of the insurance company's evaluation of the claim, and . . . the adequacy of communications between the company and the insured." *Id.* ¶ 18. No single one of these factors is controlling. *Id.; Norman v. American National Fire Ins. Co.,* 198 Ill. App.3d 269, 304, 555 N.E.2d 1087, 1110 (5th Dist. 1990).

The court concludes that disputes of fact preclude a determination in favor of either side on this issue. Maxim casts Westfield's "attitude" in the poorest possible light, and insists that the *National Decorating* decision was "in hand" from the time this lawsuit was filed. (Maxim Reply [137] at 1.) But this is not quite true. Judge Blakey did not decide the case until November 2015, a month after Westfield had filed this declaratory judgment action. Westfield could, perhaps, have withdrawn its complaint in this case after Judge Blakey had ruled; at a minimum, Westfield should have brought his decision to this court's attention. But a district court's decision is not controlling precedent, and Judge Blakey's ruling did not eliminate any good faith dispute about the scope of the coverage. *See Statewide Ins. Co. v. Houston General Ins. Co.,* 397 Ill. App. 3d 410, 426, 920 N.E.2d 611, 624 (1st Dist. 2009) ("If a bona fide coverage dispute exists, an insurer's delay in settling a claim will not be deemed vexatious or unreasonable for purposes of section 155 sanctions.")

Contrary to Maxim's insistence, Westfield did respond reasonably promptly to Maxim's notice of the pendency of the *Crystal Lake* complaint. In fact, Westfield had filed this declaratory judgment case even before Maxim was served with Crystal Lake's complaint. But the court is uncertain about the nature of Westfield's investigation of the claim: What exactly went wrong with the water treatment installation? What information, if any, did Westfield obtain, relevant to the coverage question? The "adequacy of communications" between Westfield and Maxim is also disputed. The court has concluded that Westfield had adequate notice of Crystal Lake's cross-claim in the federal *Envirogen* litigation, but Maxim offers no explanation for its own failure to comply with policy language that required it to provide Westfield with copies of

"any additional papers" filed against it.  Surely if Maxim had no obligation to notify Westfield about the cross-claim, then Westfield had no obligation to file a new declaratory judgment action concerning that cross-claim, as Maxim now suggests.

Perhaps the most significant dispute with respect to Westfield's conduct relates to its ultimate decision to provide a defense to Maxim under a reservation of rights.  Maxim contends there were strings attached, defeating a finding that Westfield acted in good faith: Maxim claims that Westfield offered to provide a defense "going forward" only, effectively requiring Maxim to waive its claim for past defense expenses, and that Westfield's insistence on choosing "panel" counsel to represent Maxim created an obvious conflict of interest.  Citing *Stoneridge Development Co. v. Essex Ins. Co.*, 382 Ill. App. 3d 731, 742, 888 N.E.2d 631, 644 (2d Dist. 2008), Westfield contends there was no conflict and it had every right to control the defense of the claims against Maxim.

Indeed, an insurer's duty to defend typically includes the right to control the defense so that the insurer may protect its financial interest in the litigation's outcome and minimize unwarranted liability claims.  *Illinois Masonic Medical Center*, 168 Ill. App. 3d at 163, 522 N.E.2d at 613.  This presents no problems when the interests of the insurer and the insured are completely aligned.  *American Family Mutual Insurance Co. v. W.H. McNaughton Builders, Inc.*, 363 Ill. App. 3d 505, 510, 843 N.E.2d 492, 498 (2006).  But in circumstances where insurer-retained counsel could "shift facts in a way that takes the case outside the scope of policy coverage, then the insured is not required to defend the underlying suit with insurer-retained counsel." *Id.* at 510, 843 N.E.2d at 498.  In *Stoneridge*, the court found no conflict where the claims against the insured builder included a claim of breach of contract, which clearly was not a covered claim, as well as a claim of breach of an implied warranty, which was potentially covered; the insurer contended neither claim was actually covered by the liability policy, and the court so held.  In the case before this court, Westfield had a basis (post-*National Decorating*) for concern that some of Crystal Lake's allegations could be a covered "occurrence" under the

policy. Such a finding might be defeated, however, if the facts were "shifted" in such a way as to make clear that all of the harm for which Crystal Lake sought recovery was in fact directly caused by Maxim's own poor workmanship.

The court concludes there is a dispute concerning the propriety of Westfield's initial insistence that Maxim accept counsel of Westfield's choice. This dispute, too, precludes summary judgment for either party on the Maxim's Section 155 claim.

## B. Cause of Default

In addition to its Section 155 claim, Maxim has argued that Westfield's delay in agreeing to provide a defense estops Westfield from relying on any policy defenses to coverage, and must pay the judgment against Maxim, as well as costs. Maxim recognizes that the filing of a declaratory judgment action ordinarily protects the insurer against estoppel, but argues that should not be the case here, where Westfield's failure to step in resulted in entry of a default against Maxim. Again, disputes preclude a determination in favor either party on this issue.

As noted, Westfield has not explained the reasons for its long deliberations, nor shed any light on the nature of the investigation it was purportedly conducting from August 2015, when Maxim notified it of the Crystal Lake claim, until June 2016, when it first offered to provide a defense under a reservation of rights. But Maxim's own conduct cries out for explanation as well. Maxim was well aware of the *Crystal Lake* litigation; was on notice of the fact that the state case was dismissed, but Crystal Lake's claims were re-filed in federal court; and knew that Westfield had filed a declaratory judgment action, seeking a determination in its favor on the coverage issue. Maxim filed an answer to the cross-claim in December 2015 and a motion for leave to file an amended counterclaim against Envirogen in January 2016. (Maxim's Answer to Cross-Claim [93 in 14 C 2090]). From what appears in the docket, Maxim's attorneys took no further steps in that case until May 4, 2016, when they moved for leave to withdraw.

Maxim notes that Westfield was, or should have been, aware of Crystal Lake's cross-claim as of March 16, when Crystal Lake filed its answer in this declaratory judgment action;

Maxim characterizes Westfield's three-month delay in taking action after that date as "devastating to Maxim." (Maxim's Response [129] at 8.) Yet Maxim offers no explanation for its own failure to take action during that period. Maxim asserts that "[o]n May 4, 2016, . . . nine months after Maxim initially requested a defense from Westfield, Maxim ran out of money and its attorneys moved for leave to withdraw . . . ." *Id.* But counsels' motion for leave to withdraw cited Maxim's failure to pay them *since 2014.* (McDermott Will & Emery's Motion for Leave to Withdraw [131 in 14 C 2090] at ¶ 2 (emphasis supplied).) The motion noted, further, that they had warned Maxim "on numerous occasions" that if the bills were not paid, counsel would need to withdraw, and that Maxim "has had sufficient time to retain replacement counsel." (*Id.*)

Whether Westfield was aware, prior to July 2016, that Maxim's litigation attorneys had withdrawn is disputed. Attorney Keith Carlson was representing Maxim in negotiations with Westfield, however, and what is not disputed is that Carlson himself was unaware, until June 23, that Maxim had failed to appear at all at two status conferences in the *Envirogen* case. That neither Maxim's insurer nor even Maxim itself bothered to monitor litigation in which more than $1 million was at stake is bewildering. It is not even clear that either party was immediately aware of the entry of default on July 7.

As described above, Westfield did ultimately agree to provide a defense. There followed brief negotiations about whether Westfield would reimburse Maxim for its earlier defense costs and whether Maxim was free to choose its own attorneys. Once those issues were resolved, Maxim's attorneys filed motions seeking relief from the default order. In those circumstances, some judges would have been willing to overlook the delays—but this was not true of Judge Zagel nor, later, Judge St. Eve. Both noted that Maxim had itself to blame for the entry of default. Maxim could have communicated with the court at any time to explain the gap in representation and request additional time. Maxim complains that Westfield "apparently believes it is entitled to completely abandon its insured once it files a declaratory judgment action[.]" (Defendants' Reply [137] at 7.) But the lengthy briefs also pay little attention to the

question of what obligations the insured has to defend itself against a liability action while a declaratory judgment action is pending. The court concludes that Maxim is not entitled to summary judgment against Westfield on its claim that Westfield is responsible for the default and estopped, as a result, from asserting policy defenses.

## III.    Damages

The matter of damages has been addressed only tangentially, so the court offers brief comment in the hope that there is a basis for settlement. The court notes, first, that neither party has identified defenses that Maxim could have mounted to Crystal Lake's claims. If there were no valid defenses, Westfield's failure to step in promptly may not have made a genuine difference in the outcome here. Notably, Judge St. Eve recognized that after a default order is entered, "allegations in the complaint related to liability are taken as true, but allegations related to damages are not." (Order in 14 C 2090 [187], at 2.) She entertained Maxim's objections to the amounts sought by Crystal Lake, and sustained many of them.

Westfield contends that the amounts ultimately awarded to Crystal Lake fall squarely within policy exclusions, and Defendants Crystal Lake and Maxim have not responded. That result defeats Crystal Lake's claim for any additional recovery against Westfield. And, unless Maxim ultimately prevails on its estoppel claim, Westfield's liability is limited to the legal fees it has already paid.

### CONCLUSION

For the reasons stated here, Westfield's motion for summary judgment [90] is granted in part and denied in part. Maxim and Crystal Lake's motion for summary judgment [127] is granted in part and denied in part as well. The court concludes that Westfield had no duty to defend or indemnify Maxim for claims asserted against Maxim by Envirogen, but did have a duty to defend Maxim against claims asserted by the City of Crystal Lake in state and federal court. Because the amounts ultimately awarded against Maxim appear to fall within policy exclusions, Westfield has no further liability to Crystal Lake. Disputes of fact preclude summary judgment in

favor of either party on Maxim's claim pursuant to Section 155 of the Illinois Insurance Code, and on Maxim's claim that Westfield is estopped from asserting policy defenses.  The parties are encouraged to discuss the possibility of settlement.

ENTER:

Dated:        April 6, 2018          _____
REBECCA R. PALLMEYER
United States District Judge